## Staunton

E. C. AKERS v. MATHIESON ALKALI WORKS.

September 20, 1928.

The opinion states the case.

4

*Hutton & Hutton, J. Irby Hurt* and *Warren & Widener*, for the appellant.

*Rushmore, Bisbee & Stern, B. F. Buchanan* and *White, Penn & Stuart*, for the appellee.

WEST, J., delivered the opinion of the court.

E. C. Akers, complainant, is the owner of seventeen acres of land in the town of Saltville, Smyth county, Virginia. This land has upon it three dwelling houses and outbuildings, and is nearly surrounded by the lands of the Mathieson Alkali Works, the defendant. The Akers land is very rugged and hilly, except a few acres upon which the buildings are located. There is an opening in the side of the hill east of the buildings from which, during and after rains, clear water formerly flowed. It was, more accurately speaking, a wet weather spring.

The defendant's tract of land contains several hundred acres and extends from complainant's land to the north fork of the Holston river. Much of this land is about 150 feet greater in altitude than the land of the plaintiff, and, like his land, beneath a layer of soil on the surface, is composed mostly of limestone rock. Defendant has on its land, about one mile from the plaintiff's land, a manufacturing plant at which it manufactures certain chemicals, including soda, soda ash and caustic soda. The raw material used consist mostly of limestone, quarried upon the land, and brine which is obtained from wells which it has sunk into the salt deposits upon the premises. In the manufacture of its products there is a large quantity of waste matter known as "muck" and "muck liquor."

According to the testimony of the complainant, "it has an offensive odor, is unfit for domestic purposes, kills fish and is destructive of trees, shrubbery and vegetation."

When the muck leaves the plant it consists of a liquid in which there is about two per cent of insoluble solid matter—slack lime and crushed lime. It is pumped into a settling-basin, where the solid particles settle to the bottom leaving the clear liquid at the top. This liquid is about eighty-seven per cent water and of the remainder a large per cent is calcium chloride and common salt, both being dissolved in the water.

Up to December 24, 1924, the muck was deposited in Basin No. 2. On that day the dam broke and as soon as practicable the defendant began to deposit the muck into two natural basins, or sinks on its own land, known as Basin No. 3 and Basin No. 4. These were emergency basins and as soon as the plant began to operate the defendant began the construction of a large artificial basin known as Basin No. 5, which will hold all the muck the plant will put out in sixty years. This basin, costing nearly one-half million dollars, was completed on December 1, 1926, and no muck has been deposited in Basin No. 3 nor in Basin No. 4 since that date.

In January, 1925, the muck liquor began to percolate from Basin No. 3 and Basin No. 4 and the tenants who used water from defendant's spring across the road from complainant's property complained that the water was unfit for use. On February 10, 1925, complainant informed the defendant that the water running from the wet weather spring contained much liquor and requested that the situation be remedied. Defendant had a ten inch pipe "run from the wet weather spring to the road and under the road to

empty into a branch that ran down the road on the opposite side thereof from complainant's property."

On June 26, 1925, there was a "blow out" and the muck ran through a leak in the bottom of Basin No. 4 in such large quantities that the pipe could not carry it off and it flowed over the complainant's yard "from the wet weather spring to the road and thence down the road to the river."

On the — day of July, 1925, complainant instituted this suit. The bill allege's in substance, that the muck was permitted to leak from the basin into an underground fissure, leading from the basin, through and under the land of the defendant, up to, by, through, under and over the land of the complainant; that by reason of the flow of the muck the buildings on his land are no longer fit for habitation; that the land of the complainant has been damaged and the trees, herbage, grasses, vines and shrubbery formerly growing thereon have been killed, and the water in the land polluted and rendered unfit for use by man or beast; that the passage of the muck and muck liquor under and upon the complainant's lands constitutes a constant and continuing trespass and is "a nuisance in fact and in law."

The prayer of the bill is that a perpetual injunction be granted enjoining and restraining the defendant from further causing or allowing the muck or muck liquor to flow under, or over the complainant's land, and that the amount of damages done complainant's property up to the granting of the injunction be ascertained by a commissioner of the court, and for general relief.

The defendant's answer to the bill alleges that it used due and proper care to prevent the escape of the muck and muck liquor from the sink or basin and is not liable for any damage resulting therefrom.

The contentions of the defendant, as set forth in its answer, are summarized by the complainant as follows:

"(a) That it was not negligent in the manner of depositing the muck on the hill above plaintiff's property.

"(b) That its plant 'represents an investment of several million dollars' and that 'thirty-five hundred persons derive their support from it.'

"(c) That the 'sink is the only accessible place,' etc.

"(d) That plaintiff's loss is 'extremely small' as compared to the loss of defendant which would be 'exceedingly great if defendant is required to cease depositing muck in said sink.' "

On a final hearing upon the pleadings and exhibits filed and the depositions of witnesses, the court by its decree entered April 12, 1927, refused to grant an injunction for the reason that defendant had theretofore ceased to make the muck deposit complained of, and because the nature of the case would make it inequitable to grant such relief. The court further decreed that an issue be made up and tried by a jury at the bar of the court, "to ascertain and determine the amount of damages, past and future, caused to complainant's property by the defendant by reason of underground drainage and percolations of muck and muck liquor from defendant's land as a result of all muck heretofore deposited thereon in defendant's dams Nos. 3 and 4."

The complainant assigns as error the action of the court:

1 In refusing to strike certain matter out of the answer of the defendant; 2 in refusing to grant the injunction prayed for; 3 in directing an issue out of chancery.

■ We find no merit in the first assignment of error. While some of the allegations of the answer are immaterial and others may not state any defense to complainant's bill, the refusal of the court to strike out the clauses referred to in the motion does not constitute reversible error.

■ The second assignment of error is based upon the court's refusal to grant an injunction restraining the defendant from "further causing and allowing the * * * muck or water to flow upon, under, through, or by the said land of complainant."

It appears, without contradiction, that no muck has been deposited in basin No. 3, or basin No. 4, since December, 1926, all the muck since that date being deposited in the new artificial basin No. 5. Nearly all the muck liquor has drained from the muck in basins Nos. 3 and 4, and only a small quantity of it now flows out of the wet weather spring under or upon complainant's land. The surface of the muck in basins 3 and 4 is free from muck liquor and has hardened; and no further deposit of muck will be made in these two basins. Under these circumstances the court did not err in refusing to grant the injunction prayed for.

■■ The granting or refusing of an injunction is a matter which rests in the sound discretion of the chancellor. The injunction will not be awarded where the injury to the defendant is greater than the benefit to the plaintiff, nor where the complainant can be adequately compensated in damages. The only way to stop absolutely the flow of a small quantity of muck liquor from basins 3 and 4 at that time would have been to remove all the muck therefrom. This would be of little benefit to the complainant and would cost the defendant $1,000,000.00. In the course of time,

presumably not very long, the supply of muck liquor in these two basins will be exhausted.

In *Clayborn* v. *Camilla, etc., Coal Co.,* 128 Va. 399, 105 S. E. 122, 15 A. L. R. 946, the court said:

"If * * * * the loss entailed upon appellee would be excessively out of proportion to the injury suffered by the appellants, or a serious detriment to the public, a court of equity might very properly and in accordance with recognized practice, deny the injunction and leave the parties to settle their differences in a court of law."

In *Clifton Iron Co.* v. *Dye* 87 Ala. 468, 6 So. 192, involving the pollution of a stream by washing minerals therein, we find this:

"Counsel have pressed the proposition that mere convenience in the use of its property by the company does not entitle it to pour down upon the appellee's land, and into the stream on his land, the debris from the washers erected by it, and we think the contention is reasonable. But it is not every case of nuisance, or continuing trespass, which a court of equity will restrain by injunction. In determining this question, the court should weigh the injury that may accrue to the one or the other party, and also the public, by granting or refusing the injunction."

In *Isenberg* v. *The East India House Estate Co. Ltd.,* 3 De Gex. J. & S. 273, Lord Chancellor Westbury said:

"To what end then should I exercise a jurisdiction which in such a case as this would be simply mischievous to the defendants, without being attended with corresponding benefit to the plaintiff, unless indeed I could approve of the plaintiff taking advantage of the mischief and loss that the defendants would have to sustain, in order to aggregate his claim for pecuniary compensation."

In *Fisk* v. *Hartford*, 70 Conn. 720, 40 Atl. 906, 66 Am. St. Rep. 147, the law is stated thus:

"The granting or refusal of an injunction rests in each particular case in the sound discretion of the court, exercised according to the recognized principles of equity. It ought not to be granted where it would be productive of great hardship or oppression, or great public or private mischief."

The third assignment of error involves the action of the court in directing an issue out of chancery.

While a court of chancery may properly, in some cases, have its commissioner ascertain the amount due to the complainant by the defendant, yet, where the amount claimed consists of unliquidated damages, and the amount of the recovery depends upon the credibility of conflicting witnesses, it is proper to direct that an issue out of chancery be submitted to a jury.

In 1 Barton's Chan. Prac. (2nd ed.) 500, Mr. Barton says:

"Where the subject in controversy is in the nature of estimated and unliquidated damages and the accuracy and credit of witnesses is impeached "an issue out of chancery is proper."

In *Isler* v. *Grove*, 8 Gratt. (49 Va.) 259, the court said:

"The case too from the character of the claim was peculiarly proper for an issue; for although it was competent for the appellees to make the alleged profits received and made by the guardian from the use and sale of the timber taken from the ward's estate a matter of account; yet the extent of the charge on this account, if any was proper, depends upon the estimate, and is in the nature of unliquidated damages, and therefore should have been submitted to a jury."

There is no merit in this assignment.

The defendant assigns as cross-error the court's ruling that complainant had sustained damages for which he was entitled to compensation from the defendant.

This assignment involves the question whether, under the circumstances of this case, the plaintiff's right to recover depends upon his proving that the injuries to his property were occasioned by the negligence of the defendant.

The defendant had the right to deposit the muck upon its own land, but no right to cause or permit it to flow upon or under and injure the land of the plaintiff. The law requires that every person so use his own property as not to injure the property of another. One who places a dangerous animal upon his own premises and permits him to escape and damage his neighbor's property must answer in damages for the injury done. When defendant permitted the muck to escape from its land and injure land of the plaintiff, without his fault, defendant was liable for the damages sustained by the plaintiff. (The evidence tends to prove that defendant has been damaged.) The loss in such cases must be borne by plaintiff or defendant and it seems just that it fall upon the defendant by whose conduct it was made possible.

The Virginia Constitution provides that property shall not be damaged for public uses without just compensation. It follows, *a fortiori*, that it cannot be damaged for private purposes without just compensation. Such taking for private purposes, though not forbidden in terms by the Constitution, is forbidden by the "fundamental principles of a republican form of government." *Boyd* v. *C. C. Ritter Lumber Co.*, 119 Va. 348, 98 S. E. 273, L. R. A. 1917A, 94.

██ In *Burwell* v. *Hobson*, 12 Gratt. (53 Va.) 325, 65 Am. Dec. 247, Judge Moncure said:

"The maxim, *sic utere tuo ut alienum non laedas*, emphatically applies to the case of a riparian proprietor, and is the true legal, as well as moral measure, of his rights."

In *Arminius Chemical Co.* v. *Landrum*, 113 Va. 7, 13 S. E. 459, 38 L. R. A. (U. S.) 272, Ann. Cas. 1913D, 1075, Judge Buchanan, quoting with approval from *Day* v. *Louisville Coal and Coke Co.*, 60 W. Va. 27, 53 S. E. 776, 10 L. R. A. (N. S.) 167, said:

"This case involves principles very important everywhere, but especially important in this State at present and in the future; but those principles are old, and have been called into requisition through many, many years, in actions for the pollution of streams, and casting into them hurtful things, and depositing them upon lands of riparian owners on the stream below. The defendant contends that, as it was using its property in carrying on a lawful business, very useful to the public, it is exempt from liability, as it was only exercising its rights. We are told by the able brief of the defendant's counsel that the affirmance of this judgment will be vastly hurtful and disastrous to the mining and coke interests of West Virginia, and have a tendency to detract from the value of our land, and hinder the development of the great wealth of coal and iron in the bowels of our mountains, and will be subversive of great public policy, which demands the developmene of our wealth therein and tends to the wealth of ths whole people of the State; and that a few individualt injured thereby must be without redress. We cannot accede to this broad proposition. The established maxim for centuries is *sic utere tuo ut alienum non laedas* (so use your own property that you do not

injure any other). That rule is almost equal to the Golden Rule in importance, and must never be lost sight of in the daily doings and transactions of organized society. A man has land upon a stream. No one is its sole lord. No one has a right to injure that land. It is protected by the Constitution. If one up the stream, in his works, be they ever so lawful, honorable, and necessary for public wealth or private wealth, do thereby injure the land of that owner further down, by unlawful invasion of it, by casting upon it things damaging to it, or by polluting the purity of the water, rendering it unfit for the owner's consumption as it passes through his land, the man up the stream must answer in damages. One man, without fault, is injured by another. That is enough for liability. This is the general principle of the common law. One man cannot thus injure another. Especially is this so in this State, where the Constitution says that private property shall not be damaged for public use without compensation. How, then, can it be damaged for private interests or to promote a supposed public policy? The authorities are ample on this subject to sustain this position."

Judge Buchanan also quotes with approval the following language of the Tennessee court in *H. B. Bowling Coal Co.* v. *Ruffner*, 117 Tenn. page 180, 100 S. W. 116, 9 L. R. A. (N. S.) 923, 10 Ann. Cas. 581:

"We are of opinion that the doctrine announced in *Pennsylvania Coal. Co.* v. *Sanderson*, 113 Pac. 126, 6 Atl. 453, 57 Am. Rep. 445, is opposed by the great weight of authority in this country and England, and is, in our opinion, subversive of fundamental private rights, while it discards  *   *   *   *   the honored principles of the common law embodied in the maxim, *sic utere tuo ut alienum non laedas*," and Judge Buchanan

further says "that one who does not use his own so as not to injure another is responsible in damages."

In 1 Shearman & Redfield on Negligence (6th ed.) page 34 we find this:

"At a very recent date it was also adjudged that one who collects a vast mass of water on his land which in its nature must be destructible if it escapes, is bound absolutely to keep it safely there and is liable for its escape even though he may be entirely free from the faintest shade of negligence. This principle takes these cases out of the realm of negligence and puts them in the same class as the liability of common carriers of goods. No question of care, diligence or skill is involved and, therefore, no negligence. The mere action of keeping a savage and dangerous animal may indeed be well deemed an act of negligence. The modern extension of this rule to the accumulation of water is rejected in New York, New Jersey, New Hampshire and California, though accepted in Massachusetts and Minnesota."

In 40 Cyc. page 684, the law is stated thus:

"One who stores water for his own purposes must so construct his dam or other works as to preclude injury to the property of others by leakage, seepage or percolation; and a conveyance for the purpose of a reservoir is no bar to the grantor's recovery for injuries to his adjoining land from percolation caused by the pressure."

In 27 R. C. L. section 128, page 1210, this is said:

"In like manner a dam that gives way in a night's rain, is not such as the maker was bound to erect. The fact that it gives way is proof that his obligation was not fulfilled and that the protection was not afforded which he was bound to provide. Where a dam gives way because of the ordinary presence of the

water it may be presumed that due care and diligence were not used either in its original construction or its subsequent maintenance; and the right of a person injured thereby does not depend on his ability to specify or prove what mistake or insufficiency in the dam caused it to give way."

In *Brennan Construction Co.* v. *Robert C. Cumberland*, 29 App. D. C. 554, 15 L. R. A. (N. S.) 535, 537, 10 Ann. Cas. 865, the plaintiff sued to recover damages done his property by oil which escaped from defendant's property. The court said:

"Whilst the adjudged cases are not in harmony on this question, we have reached the conclusion that the rule followed by the court below was correct. * * * It is true as appellant contends that every person has a right to use his property as he pleases so long as .he keeps within the law and observes the rights of those around him. * * *."

"Notwithstanding all this it constructed almost over the bed of the stream two large dams and stored thereon some 14,000 gallons of petroleum and permitted a considerable quantity to escape to the river and remain thereon for weeks, and injure innocent persons. It admits the escape but contends it should not be held liable for the consequence without proof of negligence, becuase it was engaged in a lawful business. Under circumstances of this case, it is quite clear to us that this contention is not sound. There is no evidence that it was at all necessary to locate this plant on the banks of the river and common sense tells us that asphalt and petroleum residium might have been successfully mixed in some other place where there would have been no danger of contaminating the stream and impeding traffic thereon. Having deliberately elected

to store such a large quantity of such a substance in a location where, if it escaped, the greatest amount of damage would ensue, the company must be charged with the absolute duty of keeping that substance within the limits of its own premises. This it failed to do and it must now make good the damages which directly ensued."

In *Weaver Mercantile Company* v. *Thurmond*, 68 W. Va. 530, 70 S. E. 126, 33 L. R. A. (N. S.) 1061, a hotel in the town of Thurman was supplied with water from a large wooden tank located on the side of a hill a considerable distance above the hotel. Plaintiff owned a store between the tank and the hotel. The tank burst and the water flowed down the hill into the store and damaged plaintiff's goods. He sued for damages. Defendant claimed that if there was any defect in the tank it was latent and he knew nothing about it, and that he was not liable because he was not negligent. The court held: "But as we understand the law to be the liability of defendant does not depend on negligence in construction, but upon negligence in not keeping the water confined. No matter in what the negligence consisted, it is proved by the bursting of the tank. The rule *res ipsa loquitur* applies."

In *King* v. *Hartung*, 123 Va. 185, 96 S. E. 202, a heavy gate which opened into the street fell and injured a small boy walking along the street. He sued the owner of the property to which the gate was attached and recovered. On a writ of error the judgment was affirmed by the court. In delivering the opinion of the court, Judge Kelly, referring to *McCrory* v. *Garrett*, 109 Va. 648, 64 S. E. 979, 24 L. R. A. (N. C.) 139, said: "In this class of cases the test of liability is not the lack of proper care on the part of the owner or

occupier of the building, 'but the fact of resulting injury, through no fault of his, to the party using the street.' "

In his opinion in the *King Case*, Judge Kelly refers with approval to *Gorham* v. *Cross*, 125 Mass. 232, 28 Am. Rep. 224. In this case a party wall gave way and fell injuring the building of an adjoining landowner. The defendant was held liable. In the course of the opinion of the court, the judge used the following language:

"An owner of land has the same duty to keep on his own land a house or wall built thereon as the filth in his cess pool or the water in his reservoir, or the snow and ice upon his roof."

In *Nichols* v. *Marsland*, L. R. 10 Ex. 255, it is said:

"What is the difference between a reservoir and a stack of chimneys for such a question as this? Here the defendant stored a lot of water for her own purposes; in the case of the chimneys some one has put a ton of bricks fifty feet high for his own purposes; both equally harmless if they stay where placed, and equally mischievous if they do not.

"I admit that it is not a question of negligence. A man may use all care to keep the water in or the stack of chimneys standing, but would be liable if through any defect, though latent, the water escaped or the bricks fell."

In our view, a discussion of the authorities relied on by the defendant would prove unprofitable. In so far as they are in conflict with the views herein expressed we decline to follow them.

It sufficiently appears from the evidence that the defendant permitted the muck and muck liquor

to escape from its premises and injure the property of the plaintiff. For the resulting damage the defendant is liable.

The decree will be affirmed, and the case remanded for further proceedings not in conflict with the views expressed herein.

*Affirmed and remanded.*