## Richmond

### John E. Mobley, Et Al. v. Saponi Corporation.

March 10, 1975.

Record No. 740531.

Present, All the Justices.

*Stephen H. Helvin (Haugh & Helvin,* on brief), for appellants.

*Jack N. Kegley,* for appellee.

Cochran, J., delivered the opinion of the court.

In 1970 John E. Mobley and Christine O. Mobley, his wife, acquired from Saponi Corporation a lot in Lake Saponi Subdivision in Greene County. The lot adjoins Lake Saponi, an artificial lake constructed by the Corporation. On August 23, 1973, the Mobleys filed a bill for injunction against the Corporation alleging that in August, 1972, the overflow pipe, regulating the level of the lake, collapsed and was replaced by a new and taller pipe, which caused the level of the lake to be raised and a portion of the Mobleys' lot to be inundated. The Mobleys asked that the Corporation be ordered to restore the water level to that existing before replacement of the overflow pipe and to pay them damages. After hearing the evidence *ore tenus* the chancellor, on February 7, 1974, entered a final decree denying relief to the Mobleys, and the Mobleys have appealed.

The evidence shows that Lake Saponi was dry when the Mobleys purchased their lot, and that the common boundary line

of the Mobley lot and the lake, as shown on the subdivision plat, was a straight line without any shore line indentations. Mobley testified that when the lake was subsequently filled, water stood 4 inches and 2-1/4 inches deep, respectively, at the northeast and southeast corners of his lot. He further testified that he measured again at the same corners in 1973, after the overflow pipe had been replaced and the lake refilled, and found that the water had risen to depths of 17-1/2 inches and 15-3/4 inches, respectively.

J. F. Bishop, president and sole owner of the Corporation, testified that he experienced difficulty with the original overflow pipe prior to June, 1972; that he lowered the lake but was unable to repair the pipe; and that later a flood washed out part of the dam, and the lake had to be drained. At a cost in excess of $3,000, Bishop installed a new pipe, despite his belief that he had no legal obligation to do so. He testified that he tried to construct the pipe to the same height as the original and that, after refilling the lake, the water level was within two or three inches of its original level. Other witnesses testified that the lake had been raised no more than four or five inches.

Bishop also testified that lowering the lake to its original level would be detrimental to the interests of all the property owners because it would expose "mud flats" between the higher and lower water levels. Another landowner testified that in his opinion the value of lake front properties would decrease if the lake level were lowered and that the usefulness of the lake for recreational purposes "would be restricted."

The chancellor ruled that the Mobleys had waived any objection to the original inundation of their land when the lake was first filled. He made no determination "as to how high the waters of the lake were raised above the first level by the second inundation, but [did] find that the waters at the lake were thus raised onto the [Mobleys'] property," but that the amount of the raising was "almost a *de minimis* situation." He found that the Corporation had intended no injury to the Mobleys and had not benefited from raising the level of the lake, and that lowering the waters "would hinder the rights of the other lot owners on the lake who make no objection to the water at a higher level." For these reasons the chancellor denied injunctive relief but ruled that the Mobleys were entitled to recover the actual damage to their property. The evidence as to damages consisted

solely of Mobley's testimony that the only damage was to some "native bushes" of little value. Indeed, Mobley could assign no monetary value to these bushes. Based on this evidence, the chancellor awarded no damages.

The Mobleys contend that the inundation of their property constitutes a continuing trespass, a taking of property without compensation, for which they are entitled to injunctive relief. It is true that a continuing trespass on or permanent taking of land, however insignificant, may be enjoined. Thus, in *Boerner* v. *McCallister*, 197 Va. 169, 89 S.E.2d 23 (1955), we affirmed the chancellor's granting of an injunction to restrain a defendant who continuously trespassed over an owner's land while fishing in a non-navigable stream on the land. And in *Clayborn* v. *Camilla, Etc., Coal Co.*, 128 Va. 383, 105 S.E. 117, 15 A.L.R. 946 (1920), we held that the owner of the servient tract could enjoin the overburdening of an easement to haul coal underground when there was no substantial pecuniary damage. Indeed, injunctive relief is routinely afforded to restrain the overburdening of easements. *E.g.*, *Robertson* v. *Robertson*, 214 Va. 76, 197 S.E.2d 183 (1973).

Injunctive relief, however, generally lies within the discretion of the chancellor. *Blue Ridge Poultry* v. *Clark*, 211 Va. 139, 144, 176 S.E.2d 323, 327 (1970). In *Akers* v. *Mathieson Alkali Works*, 151 Va. 1, 144 S.E. 492 (1928), we affirmed the denial of an injunction where the duration of the encroachment was uncertain and the cost to the defendant of removing it was far out of proportion to the benefit the plaintiff would receive from its removal. If the hardship to the defendant or to the public is disproportionate to the injury to the plaintiff, the chancellor properly may deny injunctive relief and leave the plaintiff to his remedy at law. *See Seventeen, Inc.* v. *Pilot Life*, 215 Va. 74, 205 S.E.2d 648 (1974).

*Stuart* v. *Lake Washington Realty Corporation*, 141 W. Va. 627, 92 S.E.2d 891 (1956), relied upon by the Mobleys, is distinguishable. There, the doctrine of balancing the equities was held inapplicable where the defendant's act in raising the water level of a lake and thereby flooding 1760 square feet of plaintiff's land was "wilful, wanton and unprovoked" or "tortious in itself."

Here, the evidence shows no wilful, wanton, or even negligent act on the part of the Corporation. The Mobleys offered no

evidence as to the amount of land inundated or as to any diminution in value of their property from the inundation. The photographs found in the record as the Mobleys' exhibits show that the Mobley property at and near the shore line is quite steep, that no significant amount of usable land was flooded, and that the Mobleys' dock, though closer to the surface of the lake than before the replacement of the overflow pipe, is no less usable and convenient. *See McCann* v. *Chasm Power Co.*, 211 N.Y. 301, 105 N.E. 416 (1914). Moreover, by restrictive covenant (13), applicable to all lots in the subdivision, the Corporation reserved a permanent easement within 10 feet of the shore line of the Mobleys' lot "for the benefit of the lake, for the purpose of maintaining the lake, such as cutting weeds, cutting the depth of the lake up to 3 feet deep at the shore line, if desired by Saponi Corporation, picking up debris, etc." There is no evidence that any water stood on the Mobleys' land beyond the limits of the easement, so that the chancellor may have concluded that any encroachment was on the portion of the land which was subject to the heavily restrictive easement.

It was clearly within the province of the chancellor to balance the equities and to deny the injunction. The final decree fails to show in any detail the manner in which the equities were balanced, and there is no written opinion to shed light upon the chancellor's reasoning. However, under familiar principles, his findings, based upon the evidence which was heard *ore tenus*, are entitled to great weight and will not be disturbed unless plainly wrong. After a careful reading of the stipulation of evidence we conclude that it was sufficient to support the chancellor's rulings. Accordingly, the decree of the trial court is

*Affirmed.*