Present: All the Justices

LEVISA COAL COMPANY

                                        OPINION BY
v.  Record No. 070580      JUSTICE LAWRENCE L. KOONTZ, JR.
                                        June 6, 2008
CONSOLIDATION COAL COMPANY

           FROM THE CIRCUIT COURT OF BUCHANAN COUNTY
                     Keary R. Williams, Judge

     This appeal arises from a dispute between the owner of a

solid mineral estate subject to a long-term mining lease and a

third party.  The dispute involves the storage of wastewater

from the third party's mining operations on other lands in a

particular mine located within the subject leasehold but with

the lessee's permission.  The owner of the solid mineral estate

sought an injunction and declaratory judgment to prevent the

third party from using the mine, which had been idled by the

lessee, as a wastewater storage pit.  We consider whether the

circuit court erred in adjudicating that the third party "has a

right to store excess water" from its mine in the mine in

question and in denying the requested injunctive relief.

                           BACKGROUND

     In 1937, Levisa Coal Corporation, the predecessor in

interest to Levisa Coal Company, the plaintiff-appellant herein,

acquired by severance deed the solid mineral estate and timber

rights on various parcels of land in Buchanan County ("the

Buchanan County parcels").[1]  The severance deed conveyed to Levisa Coal ownership of "the coal, metals and timber, together with all the rights, privileges and easements incident thereto, in, on or under" the lands described in the deed.  However, the severance deed did not expressly convey to Levisa Coal the right to use any part of the estate conveyed or the attendant easements to support mining activities on other lands.  By a separate and subsequent severance deed, the rights to the oil and gaseous mineral estates of the Buchanan County parcels were conveyed to another party.  Levisa Coal later acquired an interest in these estates through an oil, gas and coalbed methane lease.

In 1956, Levisa Coal entered into a lease with Island Creek Coal Company (Island Creek Coal) granting that company "the sole and exclusive right and privilege of mining and removing all of the coal from all the seams underlying the Tiller [V]ein or seam of coal or the horizon of such seam" in and upon the Buchanan County parcels conveyed by the 1937 deed.[2]  The 1956 lease

---

[1] Because, for purposes of this appeal, there is no significant distinction between these two entities, we will refer to the owner of the solid mineral estate as "Levisa Coal" without distinction as to whether the reference is to the current owner or its predecessor in interest.

[2] The "Tiller Vein" refers to a particular deep-lying coal seam that has been identified by that name in geological surveys of western Virginia for at least the last ninety years.  See,

2

further provided Island Creek Coal with the right "generally, to make any use of the leased premises which [Island Creek Coal] may deem needful or convenient in carrying on its mining or other operations." Among the specific uses permitted was the right to "dump water or refuse on said premises." These rights, however, were "limited to such rights as [Levisa Coal] owns and has the right to lease," and the lease did not expressly purport to convey any right to use the leasehold for the support of mining operations on other lands.

Under the 1956 lease, Levisa Coal retained certain rights to the ownership and continued use of its solid mineral estate below the Tiller Vein and to easements serving Island Creek Coal's leasehold. As relevant to this appeal, Levisa Coal retained "[t]he entire ownership and control of all the leased premises, and the coal . . . and other minerals and products therein and thereon, for all purposes (except those hereinbefore expressly set forth as leased to [Island Creek Coal])." Additional express rights reserved to Levisa Coal included "the right and privilege of draining water . . . over, across, or through the leased premises," as well as "the right and privilege of searching for oil, gas, or any other minerals or products and removing same when and wherever found." In

_____

e.g., H. Hinds, The Geology and Coal Resources of Buchanan

3

furtherance of these rights, the lease provided that Levisa Coal could make excavations and bore "slopes, shafts, drifts, tunnels, and wells" so long as these operations did not interfere with Island Creek Coal's right under the 1956 lease to remove coal from below the Tiller Vein. Levisa Coal also retained a right of inspection within Island Creek Coal's works and mines to assure compliance with an agreed upon mining plan and calculation of royalties due under the lease and "to use freely the means of access to the said works and mines without hindrance or molestation" consistent with its rights under the 1937 deed.

The initial term of the 1956 lease was for five years with the lease automatically renewing for successive terms of twenty years so long as Island Creek Coal fulfilled its obligation to mine coal on the property and pay royalties to Levisa Coal, or in lieu thereof to make minimum payments to Levisa Coal for the lost opportunity if coal was not being mined. At issue in this appeal is a mine designated by Island Creek Coal as the "VP3 Mine," which was opened on land subject to the 1956 lease in 1968. Although Island Creek Coal suspended its mining operations at the VP3 Mine in 1998, Levisa Coal does not contend that Island Creek Coal has failed to pay royalties or fulfill

---

County, Virginia, Bulletin XVIII (VA Geol. Survey 1918).

its other obligations under the lease and, thus, under its terms the lease remains in force until at least 2021. Moreover, Levisa Coal, through its managing general partner John C. Irvin, conceded during the proceedings of this case that it is not presently economically feasible to resume coal mining operations at the VP3 Mine.

In 1993, CONSOL, Inc. (CONSOL), a subsidiary of CONSOL Energy, Inc., acquired Island Creek Coal and all of its assets, including the rights and obligations of the 1956 lease. CONSOL has maintained Island Creek Coal as a separate corporate entity, although Island Creek Coal no longer has any active mining operations or employees and its corporate officers are also officers or employees of CONSOL or its subsidiaries. CONSOL is also the parent company of Consolidation Coal Company (Consolidation Coal), the defendant-appellee herein. Consolidation Coal maintains a coal mining operation, designated as the "Buchanan Mine" or "Buchanan No. 1 Mine" in the vicinity of Island Creek Coal's VP3 Mine as well as other idled mines once operated by Island Creek Coal.

Excess ground water naturally flowing into any deep mine as a result of mining operations hampers extraction of coal. Mine operators routinely remove such excess water or wastewater on a daily basis. The removal of excess water in the Buchanan Mine, as well as the excess water in the VP3 Mine, was initially

accomplished by pumping that water directly into the nearby Levisa River or one of its tributaries. At some point after the acquisition of Island Creek Coal by CONSOL, it became necessary for Consolidation Coal to devise an alternate drainage system for the removal of excess water naturally flowing into its Buchanan Mine and the additional water released into that mine as a result of its continuing mining operations there. In general terms, the drainage system devised by Consolidation Coal involved pumping the excess water from the Buchanan Mine into a series of nearby idled mines once operated by Island Creek Coal which functioned as storage pits for the water until the water could be pumped into the Levisa River. Ultimately, this drainage system was designed to include the idled VP3 Mine. The rate of discharge of the wastewater into the river was to be limited from time to time so that the Levisa River could accommodate the increased water flow resulting from this discharge.

Ultimately, the chloride content of the anticipated discharged water into the Levisa River became an issue to be resolved in order for Consolidation Coal to comply with certain water standards established by the State Water Control Board and to obtain the necessary permits to allow it to continue to pump mine water into the Levisa River. Consolidation Coal applied to the Virginia Department of Mines, Minerals, and Energy (DMME)

6

for permits to discharge wastewater from the Buchanan Mine into idled mines under Island Creek Coal's control, including the VP3 Mine, and ultimately into the Levisa River in accord with its designed drainage system.[3]  Subsequently, Consolidation Coal began discharging wastewater into the "Beatrice" and "VP1" mines and, when these mines could not accommodate additional water, the discharge was diverted to the VP3 Mine.  The present rate of wastewater discharge from the Buchanan Mine into the VP3 Mine is nearly 2,500 gallons per minute.  The VP3 Mine has a capacity to hold approximately 6.4 billion gallons of wastewater.

On July 10, 2006, Levisa Coal filed a complaint for injunctive relief and declaratory judgment against Consolidation Coal in the Circuit Court of Buchanan County seeking to prohibit Consolidation Coal from continuing to divert wastewater from the Buchanan Mine to the VP3 Mine.  In seeking temporary and permanent injunctive relief, Levisa Coal maintained that "[t]he proposed pumping and storage of Buchanan Mine water in Levisa [Coal]'s properties will cause irreparable harm to Levisa [Coal]'s property and business interests."  Specifically, Levisa Coal maintained that storing water in the VP3 Mine would result

---

[3] According to statements in the record, Levisa Coal, by separate litigation, challenged the issuing of a permit by DMME to allow discharge of water into the VP3 Mine.  The record does not disclose the current status or result of that litigation.

in absorption of coal bed methane gas and, with regard to the remaining coal in the property, would "vastly increase the costs that will be required in order to safely access and mine the coal in the future, effectively making it unminable." Levisa Coal further maintained that it had no adequate remedy at law to redress these alleged injuries.

Levisa Coal premised its action for declaratory judgment on the assertion that Consolidation Coal "lacks the legal right to pump and store its Buchanan Mine water in the [VP3 Mine]." It sought a declaration that Consolidation Coal "has no right to utilize Levisa [Coal]'s subject properties for temporary or permanent storage of Buchanan Mine water, and for judgment adjudicating all other issues expressly or inferentially raised."

On August 4, 2006, Consolidation Coal filed an omnibus response to the complaint, supported by an accompanying memorandum of law, asserting a demurrer, special plea in bar, answer and affirmative defenses. As relevant to this appeal, Consolidation Coal maintained that it had a legal right to discharge wastewater into the VP3 Mine because Island Creek Coal, consistent with its purported rights under the 1956 lease, had agreed to permit Consolidation Coal to discharge the water into the VP3 mine. Consolidation Coal further maintained that Levisa Coal was not entitled to seek an injunction as it was not

8

suffering any harm from the discharge of water into Island Creek Coal's leasehold, or, in the alternative, even if Levisa Coal were being injured by that action, it had an adequate remedy at law in the form of seeking monetary damages now or in the future.

The parties engaged in a lengthy period of discovery before Levisa Coal sought a hearing to request entry of a preliminary injunction. The circuit court conducted an ore tenus hearing on the request for a preliminary injunction on November 15 and 16, 2006. At that hearing, Levisa Coal took the position that, despite any agreement between Consolidation Coal and Island Creek Coal by which Island Creek Coal would purportedly accept responsibility for the dumping of water into the VP3 Mine, "it is Consolidation Coal Company that is doing it." Levisa Coal maintained that the 1956 Lease provided Island Creek Coal with the right to mine coal, but provided no right for Island Creek Coal to permit Consolidation Coal to put water into the mine.

In response, Consolidation Coal took the position that it was Island Creek Coal, not Consolidation Coal, that was actually putting water into the VP3 Mine and that Island Creek Coal was doing so in a manner consistent with its rights under the 1956 lease. Consolidation Coal noted that even prior to the acquisition of Island Creek Coal by CONSOL, the two companies had cooperated in their respective mining efforts in the region.

Consolidation Coal maintained that both companies had benefited from, and continued to benefit from, arrangements whereby mining operations on the lands and leaseholds of one were supported by activities on the lands and leaseholds of the other.  In this context, Consolidation Coal asserted that Island Creek Coal's storage of the Buchanan Mine water in the VP3 Mine was a "use of the leased premises which [Island Creek Coal] may deem needful or convenient in carrying on its mining or other operations" as contemplated by the 1956 lease.

Consolidation Coal further contended that even if it, and not Island Creek Coal, were deemed to be the party responsible for the inundation of the VP3 Mine, it was doing so only within the voids, tunnels and shafts created in Island Creek Coal's leasehold below the Tiller Vein and, thus, in an area over which Levisa Coal had no current possessory interest.  Thus, Consolidation Coal contended that Levisa Coal did not have standing to seek any relief against Consolidation Coal. Moreover, assuming that Levisa Coal had such standing, to the extent that it might suffer some damage to its interest in the gaseous mineral estate, which Consolidation Coal did not concede, Consolidation Coal maintained that such damage was a quantifiable harm for which Levisa Coal could seek a monetary award at law.  As to any other damages Levisa Coal might suffer as a result of impairment of its retained rights under the 1956

10

lease, Consolidation Coal maintained that these damages were "speculative" because the VP3 Mine was currently idle and there was no prospect of it being reopened for coal production or any other purpose. Thus, Consolidation Coal maintained that Levisa Coal could not establish irreparable harm for which injunctive relief should be granted.

Levisa Coal introduced evidence through testimony from Irvin, from Gerald Ramsey, a former employee of Island Creek Coal now employed by CONSOL Energy, from Andrew Cecil, a mining engineer, and from Charles Earl Ellis, a former employee of Island Creek Coal now working as an independent consultant who was qualified as an expert on business operations in the mining industry. We need not recount the substance of this testimony in detail, it being sufficient to say that Irvin, Ramsey and Ellis confirmed the history of the VP3 Mine and the relationship between Island Creek Coal and Consolidation Coal as related above. Additionally, Irvin testified concerning Levisa Coal's interest in the production of coal bed methane gas on the Buchanan County parcels.

Cecil's testimony provided support for Levisa Coal's contention that inundation of the voids, tunnels and shafts in the VP3 Mine would significantly impair the coal reserves of Levisa Coal in that portion of its estate and the adjoining strata. Cecil opined, for example, that water in the VP3 Mine

11

would be absorbed into the sandstone and shale layers above and below the coal seam, creating "issues" for the stability of the roof and floor of the mine, affecting the use of the mine tunnels and shafts for future access to the coal reserves in the strata below the Tiller Vein as well as increasing the cost of mining those reserves.

Levisa Coal also sought to introduce evidence of the potential damage to the gaseous mineral estate of the Buchanan County parcels in the form of an affidavit prepared by Timothy L. Hower. Levisa Coal contended that Hower was unavailable to testify in person because he was outside the United States on other business. Levisa Coal averred that it had attempted to make Hower available for cross-examination by deposition or by having the hearing conducted on a date when he would have been available, but contended that Consolidation Coal had "refused" to take Hower's deposition and implied that other difficulties with the discovery process had delayed the hearing until Hower was unavailable. Consolidation Coal responded that its objection was not merely that Hower was unavailable for cross-examination, but because the substance of his opinion as outlined in the affidavit was "speculative." The circuit court indicated that it would not "rul[e] on the substance of the affidavit," but that it would nonetheless exclude it from evidence because "it is patently unfair to allow this witness to

12

testify by affidavit without giving defendant's counsel the opportunity to cross examine."

Following the circuit court's ruling excluding Hower's affidavit, Levisa Coal rested its case in chief. Consolidation Coal then moved to strike Levisa Coal's evidence, contending that Levisa Coal had failed to establish that it would suffer any irreparable harm if the temporary injunction were not granted. This was so, Consolidation Coal maintained, both because the injury from the alleged trespass was merely speculative and, if actual, could be redressed by monetary damages awarded at law.

In addressing the motion to strike Levisa Coal's evidence, the circuit court stated that in its view the principal claim made by Levisa Coal with respect to the harm it would suffer from the inundation of the VP3 Mine was to "its coal and gas estate, although it is contested that it has a gas estate . . . there is some evidence here where the Court may conclude as much." The court concluded, however, that any damages to Levisa Coal's interests were quantifiable and, thus, it "has an adequate remedy at law if it in any way lost its coal estate, . . . gas or coal bed methane estate." The court further concluded that granting the preliminary injunction could result in "astronomical" harm to Consolidation Coal in that it possibly would be required to suspend operations at the Buchanan Mine.

13

Accordingly, the court ruled that Levisa Coal had not met its evidentiary burden for obtaining a preliminary injunction.

The circuit court then ruled that the provision in the 1956 lease that granted to Island Creek Coal "use of the leased premises which lessee may deem needful or convenient in carrying out its mining operations or other operations" was "about as broad and expansive as we might imagine." Applying that interpretation of the lease, the court ruled that with respect to the declaratory judgment Consolidation Coal "has the right to place any kind of storage water in the [VP3] [M]ine." Accordingly, the court indicated that it did not need to hear evidence from Consolidation Coal's witnesses and directed counsel for Consolidation Coal to draft an order reflecting the court's rulings.

On December 13, 2006, counsel for Consolidation Coal submitted a draft order adopting by reference the circuit court's summation at the conclusion of the hearing and, in addressing the court's ruling on the declaratory judgment issue, reflecting that Levisa Coal had "requested in this hearing that the Court construe the November 16, 1956 Lease, and the rights imparted therein." On December 20, 2006, counsel for Levisa Coal submitted a lengthy set of written objections to the court's anticipated rulings as reflected in the court's summation and the draft order.

On December 22, 2006, the circuit court entered a separate order, which simplified the language of the draft order submitted by Consolidation Coal, but in substance reflected the court's rulings on Levisa Coal's requests for a preliminary injunction and declaratory relief. On the latter issue, the court expressly ruled that Consolidation Coal "has the right to store excess water from the Buchanan No. 1 [Mine] in the VP3 Mine." Although the draft order had not done so, the court's order further provided that it was a final order "resolving all issues between the parties." Pursuant to Rule 1:13, the order was entered without endorsement of counsel "with the understanding that all objections the Parties have stated in the record are hereby preserved" including Levisa Coal's written objections submitted on December 20, 2006. We awarded Levisa Coal this appeal.

DISCUSSION

Levisa Coal has asserted 12 assignments of error to a number of aspects of the circuit court's conduct of the hearing held in this case and its final judgment. However, given the procedural posture of this case, we are of opinion that we need not address all of these assignments of error. As we have previously noted, the hearing was noticed on Levisa Coal's request for a temporary injunction. The circuit court ruled on the merits of the request for a declaratory judgment and denied

15

injunctive relief after sustaining Consolidation Coal's motion to strike the evidence at the conclusion of Levisa Coal's evidence in chief. Accordingly, the resolution of Levisa Coal's appeal rests principally upon two issues.[4] First, we will consider whether the circuit court correctly construed the 1956 lease as providing Island Creek Coal, and, by extension, Consolidation Coal through Island Creek Coal's permission, with

---

[4] While the petition for appeal in this case was under review, Consolidation Coal filed a motion to dismiss the petition for appeal and a renewed motion to dismiss. In those motions, Consolidation Coal contends that because the ruling on the declaratory judgment had been made at Levisa Coal's request, as recited in the circuit court's order, and Levisa Coal had not then sought a reconsideration of that ruling, it is barred from seeking review of that ruling on appeal. At oral argument of this appeal, counsel for Consolidation Coal again asserted that by requesting the inclusion of the court's ruling in the order, Levisa Coal is barred from pursing an appeal on this point. We disagree.

It is entirely proper for a party to request that a court memorialize in an order a ruling made from the bench, even when that ruling is contrary to the party's interest. Levisa Coal noted its objection to the court's interpretation of the 1956 lease as permitting the storage of water from any source within the VP3 Mine in the written objections submitted to the court prior to the entry of the final order, and those objections were expressly preserved by reference in that order. Thus, it was not necessary for Levisa Coal to renew its objection by a motion for reconsideration or any other means after entry of the final order. See, e.g., Chawla v. BurgerBusters, Inc., 255 Va. 616, 621-23, 499 S.E.2d 829, 832-33 (1998)(error preserved by plaintiff's written motion and supporting oral argument when objection noted on circuit court's final order). Accordingly, to the extent we have not already disposed of the matter by granting the petition for appeal, Consolidation Coal's motion to dismiss and renewed motion to dismiss are denied. Similarly, we find no merit to Consolidation Coal's contention made on brief

"the right to store excess water from the Buchanan No. 1 [Mine] in the VP3 Mine." Second, if the 1956 lease does not provide Island Creek Coal with the right to permit Consolidation Coal to store excess water from the Buchanan Mine in the VP3 Mine, we will consider whether the record supports the circuit court's denial of Levisa Coal's request for injunctive relief.

### Interpretation of the 1956 Lease

Like all leases, a mining lease is a contract and "when the terms of a contract are clear and unambiguous, a court must give them their plain meaning." Pocahontas Mining L.L.C. v. Jewell Ridge Coal Corp., 263 Va. 169, 173, 556 S.E.2d 769, 771 (2002). On appeal, we review a trial court's interpretation of a lease under a de novo standard. See Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 631, 561 S.E.2d 663, 667 (2002) ("on appeal we are not bound by the trial court's interpretation of the contract provision at issue; rather, we have an equal opportunity to consider the words of the contract within the four corners of the instrument itself"); Wilson v. Holyfield, 227 Va. 184, 187-88, 313 S.E.2d 396, 398 (1984).

Levisa Coal contends that the circuit court misinterpreted the language of the lease allowing "any use of the leased premises which [Island Creek Coal] may deem needful or

of this appeal that Levisa Coal's written objections did not

17

convenient in carrying on its mining or other operations" as permitting the support of mining operations on other lands. Levisa Coal initially notes that, under Clayborn v. Camilla Red Ash Coal Co., 128 Va. 383, 105 S.E. 117 (1920), the 1937 deed conveying to it the solid mineral estate of the Buchanan County parcels permitted only a "necessary incidental easement" for purposes of removing the coal and other minerals. Id. at 390, 105 S.E. at 119. Thus, Levisa Coal maintains that it did not obtain the right under the 1937 deed to support mining operations on other lands by permitting the inundation of the subsurface area with wastewater. Accordingly, Island Creek Coal could not have obtained the right to do so within its leasehold because the 1956 lease expressly limited the easements Levisa Coal granted to Island Creek Coal "to such rights as [Levisa Coal] owns and has the right to lease." We agree with Levisa Coal.

In Clayborn, we were required to determine, as a matter of first impression in Virginia, whether a trespass had occurred against the rights of the owner of the surface estate[5] where the

_____

satisfy the contemporaneous objection requirement of Rule 5:25.

[5] "Surface estate" is a term intended generally to refer to the rights of the owner of that portion of the original tract of land that has not been severed by deeds granting rights in the mineral estate or other resources of the tract of land. As Clayborn made clear, the rights of the surface owner are not limited to control of the surface area, but, depending on what

18

owner of the severed coal estate was transporting coal from adjacent mining operations on other lands through the tunnels and shafts beneath the surface estate. We recognized that under "[t]he prevailing if not wholly unbroken current of authority . . . a grantee of coal in place is the owner, not of an incorporeal right to mine and remove, but of a corporeal freehold estate in the coal, including the shell or containing chamber, and that as such owner he has the absolute right, until all of the coal has been exhausted, to use the passages opened for its removal for any and all purposes whatsoever, including in particular the transportation of coal from adjacent lands, so long as he operates and uses the passages with due regard to the rights of the surface owner." 128 Va. at 388, 105 S.E. at 118.

After extensively reviewing the law from other jurisdictions, we held that a deed or lease transferring a coal estate or portion thereof is "the grant of an estate determinable [and w]hen the coal is all removed the estate ends for the plain reason that the subject of it has been carried away." Id. at 393, 105 S.E. at 120. Thus, "[t]he space [the coal] occupied reverts to the grantor by operation of law." Id. Accordingly, we concluded that the right to use the tunnels and

---

rights are retained, may extend into the subsurface area. Clayborn, 128 Va. at 388, 105 S.E. at 118.

shafts extended only to the mining operations within the determinable estate, and not to the support of mining operations on other lands.  We further held that "[i]f the coal owner expects more" than the right to mine and remove the coal within his estate "he ought to stipulate for it" in the deed or lease. Id. at 397, 105 S.E. at 122.

Although our decision in Clayborn was not consistent with the majority view of other jurisdictions, see id. at 401-02, 105 S.E. at 123 (Prentis, J., dissenting), with respect to the issue in this case that decision is in line with the long established view in American law that "[t]he owner of a mine . . . may allow the water therein to flow in natural channels and percolations into an adjoining mine, but he may not, in absence of an easement or license to do so, discharge [water] by means of artificial drains into such adjoining mine."  Daniel M. Barringer and John S. Adams, The Law of Mines and Mining in the United States 631 (1900).  This principle applies both to mines at different levels within the same subsurface area of a single tract of land as well as to mines on different tracts of land.

We can discern no practical distinction between supporting adjoining mining operations by using tunnels and shafts to transport coal, as in Clayborn, and the storing of wastewater from such operations in the voids, tunnels and shafts of an unrelated mine, as in this case.  Accordingly, we are of opinion

20

that when the 1937 deed conveyed the solid mineral estate of the Buchanan County parcels to Levisa Coal, the parties to that deed contemplated only that the coal and other minerals would be mined from that estate, and that the deed conveyed only an incidental easement to use that portion of the parcels retained by the surface owner as was necessary to support such mining operations.  Nothing in the deed conveyed any right to use the voids, tunnels and shafts created below the surface for any purpose other than to support the mining operations on those parcels.

Since the 1937 deed conveyed no right to use any portion of the mineral estate to support mining operations on other lands, the 1956 lease could not have granted such right to Island Creek Coal.  Accordingly, even if we were to accept Consolidation Coal's argument that there was an incidental benefit to Island Creek Coal's long-term operational plan for mining the Buchanan County parcels by permitting wastewater from the Buchanan Mine to be stored in the VP3 Mine, Island Creek Coal simply lacks the authority to permit Consolidation Coal to store wastewater from other mining operations in the VP3 Mine.  Clearly, Island Creek Coal did not stipulate for such a use of the leasehold in the 1956 lease, nor could Levisa Coal have granted such rights even if they had been sought.  Thus, we hold that the circuit court

21

erred in ruling that Consolidation Coal has a right to store
wastewater from the Buchanan Mine in the VP3 Mine.

<u>Denial of Levisa Coal's Request for Injunctive Relief</u>

Because the circuit court premised its judgment to deny
Levisa Coal's request for injunctive relief, at least in part,
on its erroneous determination that Consolidation Coal had the
right to store excess water from the Buchanan Mine in the VP3
Mine, we will reverse that judgment.  Additionally, because the
circuit court rendered that judgment in the procedural posture
of the case which resulted in an insufficient record for this
Court on appeal to resolve the issue of Levisa Coal's
entitlement to injunctive relief, we will also remand the case
for further consideration of that issue by the circuit court.

Upon appeal, Consolidation Coal has contended, as it did in
the circuit court, that Levisa Coal lacks standing to seek
injunctive relief in this case because the 1956 lease divested
it of a present possessory interest in the leasehold given to
Island Creek Coal.  While the circuit court did not expressly
address this contention, implicitly the court rejected it by
reaching the merits of Levisa Coal's requested relief.  The
record sufficiently reflects that Levisa Coal's rights and
interests are not limited to those of its retained ownership of
the coal reserves below the Tiller Vein that Island Creek Coal
presently has a right to mine.  In addition, Levisa Coal

22

reserved the right to explore for and remove other minerals under the 1956 lease, and the circuit court found that there was sufficient evidence, even without Hower's affidavit, that inundation of the VP3 Mine with excess water from the Buchanan Mine would potentially damage the coal bed methane and other gas deposits associated with the VP3 Mine and adjoining strata in which Levisa Coal owns an interest. Accordingly, there is no merit to Consolidation Coal's contention that Levisa Coal lacks standing to seek injunctive relief in this case, and that contention will not be an issue upon remand of this case to the circuit court.

Levisa Coal's standing to seek injunctive relief in the present case, however, is not sufficient alone to establish an entitlement to such relief. Under well established principles, which will be applicable upon remand here, the granting of an injunction is an extraordinary remedy and rests on sound judicial discretion to be exercised upon consideration of the nature and circumstances of a particular case. See, e.g., Fancher v. Fagella, 274 Va. 549, 556, 650 S.E.2d 519, 522 (2007), Seventeen, Inc. v. Pilot Life Ins. Co., 215 Va. 74, 78, 205 S.E.2d 648, 653 (1974); Akers v. Mathieson Alkali Works, 151 Va. 1, 8, 144 S.E. 492, 494 (1928).

We also note that because of the absence of any right of Consolidation Coal to store excess water from its mine in the

23

VP3 Mine and the evidence in the record that it is currently doing so, the issue before the circuit court will no longer involve the consideration of temporary injunctive relief but, rather, whether the circumstances warrant the issuance of a permanent injunction.[6]  In that regard, the circuit court may have the benefit of additional evidence on the issue of the damages that inundation of the VP3 Mine may cause to Levisa Coal's interests in the gaseous mineral estate associated with the VP3 Mine and the adjoining strata.  Similarly, Consolidation Coal must be afforded the opportunity to present evidence to support its contention that Levisa Coal has an adequate remedy at law in the form of monetary damages resulting from the inundation of the VP3 Mine with wastewater from Consolidation Coal's mine.

The principles that a court must apply in properly exercising its discretion to grant or deny a permanent injunction have been identified in prior decisions of this Court.  "Under traditional equitable principles, a chancellor

---

[6] In the circuit court Consolidation Coal urged the application of a four-factor approach for determining whether a preliminary injunction should issue, similar to that adopted by the United States Court of Appeals for the Fourth Circuit in Blackwelder Furniture Co. v. Seilig Manufacturing Co., Inc., 550 F.2d 189, 195-96 (4th Cir. 1977), for issues arising under F.R.Civ.P. 65.  In the posture of this appeal it is not necessary to address that issue, and we express no view upon the matter.

may enjoin a continuing trespass." Fancher, 274 Va. at 556, 650 S.E.2d at 522. See also Nishanian v. Sirohi, 243 Va. 337, 339, 414 S.E.2d 604, 606 (1992); Mobley v. Saponi Corporation, 215 Va. 643, 645, 212 S.E.2d 287, 289 (1975). However, even in a case involving a continuing trespass the guiding principle which remains constant is that the granting of an injunction is an extraordinary remedy and rests on the sound judicial discretion to be exercised upon consideration of the nature and circumstances of a particular case. See, e.g., Fancher, 274 Va. at 556, 650 S.E.2d at 522; Seventeen, Inc., 215 Va. at 78, 205 S.E.2d at 653; Akers, 151 Va. at 8, 144 S.E. at 494. Thus, in a case of a continuing trespass, such as the present case, we have stated that if "the loss entailed upon [the trespasser] would be excessively out of proportion to the injury suffered by [the owner], or a serious detriment to the public, a court of equity might very properly . . . deny the injunction and leave the parties to settle their differences in a court of law." Clayborn, 128 Va. at 399, 105 S.E. at 122.

We have also observed that unless a party is entitled to an injunction pursuant to a statute, a party must establish the "traditional prerequisites, i.e., irreparable harm and lack of an adequate remedy at law" before a request for injunctive relief will be sustained. Virginia Beach S.P.C.A., Inc. v. South Hampton Rds. Veterinary Assoc., 229 Va. 349, 354, 329

25

S.E.2d 10, 13 (1985); see also Carbaugh v. Solem, 225 Va. 310, 315, 302 S.E.2d 33, 35 (1983).  Clearly, if the plaintiff has no adequate remedy at law, equity will not countenance a continuing trespass merely because the trespasser, or even the public at large, will be benefited by allowing the trespass to continue. See Frank Shop, Inc. v. Crown Cent. Petroleum Corp., 264 Va. 1, 7, 564 S.E.2d 134, 137 (2002).

When an injunction is sought to enforce a contract right concerning personal property, the plaintiff has a high burden of showing that the failure to enjoin the alleged improper action will result in irreparable harm for which the law will afford him no adequate remedy.  See, e.g., Griscom v. Childress, 183 Va. 42, 47, 31 S.E.2d 309, 312 (1944); Langford v. Taylor, 99 Va. 577, 580, 39 S.E. 223, 224 (1901).  Unless the plaintiff can demonstrate that the property it seeks to protect has some personal value of sentiment or other intangible quality that cannot be restored to him at law, Langford, 99 Va. at 580, 39 S.E. at 224, or that monetary damages would otherwise not make him whole, the court will deny the injunction because the legal remedy is sufficient.  Moore v. Steelman, 80 Va. 331, 339-40 (1885).  Accordingly, in such cases, the court will give due weight to the adverse effect of the injunction being granted on the defendant.

By contrast, when the injunction is sought to enforce a real property right a continuing trespass may be enjoined "even though each individual act of trespass is in itself trivial, or the damage is trifling, nominal or insubstantial, and despite the fact that no single trespass causes irreparable injury.  The injury is deemed irreparable and the owner protected in the enjoyment of his property whether such be sentimental or pecuniary."  Boerner v. McCallister, 197 Va. 169, 172, 89 S.E.2d 23, 25 (1955); accord Fancher, 274 Va. at 556, 650 S.E.2d at 522-23; Clayborn, 128 Va. at 398-99, 105 S.E. at 122.

Thus, in Clayborn we did not find that the alleged harm to the defendant constituted "the exceptional grounds" needed to require the owner of real property rights to forgo those rights for a purely legal remedy.  Id. at 399, 105 S.E. at 122.  Even though it was apparent from the record that the defendant could have negotiated the right to use the property "upon reasonable terms," we held that the court could not impose such terms on the parties and, thus, the injunction ought to have been granted.  Id. at 400, 105 S.E. at 123.

Similarly, in Blue Ridge Poultry & Egg Co. v. Clark, 211 Va. 139, 176 S.E.2d 323 (1970), we rejected the claim that an injunction ought not to issue to protect a landowner from a noxious intrusion of effluent onto his land from a neighboring industrial farming operation.  Despite the fact that the

27

chancellor had found that the damages to Clark's property were quantifiable in terms of lost rent, we nonetheless held that "[t]he doctrine of 'balancing of equities' must be viewed in light of our long-standing pronouncement that a private landowner is to be protected for injuries he may sustain 'even though inflicted by forces which constitute factors in our material development and growth.' " Id. at 144, 176 S.E.2d at 327 (quoting Townsend v. Norfolk Ry. & Light Co., 105 Va. 22, 49, 52 S.E. 970, 978 (1906)).

By contrast, in Akers we found that where the trespass had essentially stopped by the time the case had come to trial, granting an injunction "would be of little benefit to the complainant and would cost the defendant $1,000,000.00." Akers, 151 Va. at 8, 144 S.E. at 494. In such a case, the availability of a remedy at law was clearly appropriate, and thus an injunction was not appropriate. Id.; see also Mobley, 215 Va. at 646, 212 S.E.2d at 290.

Upon remand the circuit court will be guided by these principles after granting the parties the opportunity to present evidence regarding them.

## CONCLUSION

For these reasons, we will reverse the judgment of the circuit court and remand the case for further proceedings consistent with the views expressed in this opinion.

28

Reversed and remanded.