# CIRCUIT COURT OF SHENANDOAH COUNTY

Shenandoah County
School Board

v.

Timothy C. Carter,
Sheriff

April 29, 2016

Case No. 16-79

By Judge Thomas J. Wilson, IV

This matter came before the Court on April 27, 2016, on Petitioner's Amended Complaint, which requested injunctive relief and a Writ of Mandamus, and Respondent's Demurrer. During a teleconference on April 25, 2015, both parties agreed to argue the Demurrer and, if necessary, hold the trial on the Amended Complaint on April 27, 2016. At the beginning of the April 27th hearing, the Court heard argument on Respondent's Demurrer and, as set forth in the record, overruled the Demurrer. The Court then heard testimony, received exhibits into evidence, and heard argument on the Amended Complaint, ultimately taking the matter under advisement. I have reviewed all pleadings, evidence on record, and argument of counsel. I rule as follows.

## Findings of Fact

Based upon the evidence presented, I make the following findings of fact.

On January 12, 2016, Dr. Jeremy Raley, Superintendent of the school division, received a phone call from Morgan Saeler, Principal of Strasburg High School. Principal Saeler explained that he had received information regarding an incident on a school bus and an investigation had begun.

The incident in question occurred on December 19, 2015, on a school bus transporting members of the Strasburg High School boys' varsity and junior varsity basketball teams from games in Moorefield, West Virginia.

Both Superintendent Raley and Principal Saeler described the misconduct as "appalling." Principal Saeler also described it as "violent."

Eventually, Principal Saeler obtained the school bus's video surveillance digital hard drive. I find that this video, taken on school property (the bus) during a school-sponsored activity (transportation from a school basketball game) and recording the actions of school students, is school property. The purpose of the surveillance camera is to monitor the safety and well-being of the students and aid in investigations of student misconduct.

The school administration began the process of reviewing and processing the information and developing a plan "to ensure the safety of all students at Strasburg High School."

This included working with law enforcement officers, who met with school administrators in the assistant principal's office on the evening of January 12, 2016. At that time, the officials discussed whether the video should be provided to law enforcement and if copies should be made. Superintendent Raley told the officers that he needed a copy, but some elements of the conversation evinced a concern that the video might constitute child pornography; however, Raley stated that he understood the video would be made available whenever it was needed. Consequently, the school administration turned over the original hard drive to law enforcement. On the totality of the evidence, I find that the decision to allow law enforcement to hold the video was a joint decision made by the law enforcement officers and school administrators present on January 12, 2016, with the expectation that there would be cooperation among them.

Since the Sheriff's department obtained the original video footage, the video has remained secure in the Sheriff's evidence locker. Copies were made, with Amanda Wiseley, the Commonwealth's Attorney for Shenandoah County, receiving one copy and at least one "working copy" being made available to Investigator Paul Taylor for purposes of creating still images. The list of individuals that viewed a copy of the video, or parts of it, include: Principal Saeler and Superintendent Raley; investigators with the Shenandoah County Sheriff's Department; the Department of Social Services in two Virginia jurisdictions; the Commonwealth's Attorney's office; defense counsel in the criminal proceedings; and some students and parents. The Sheriff testified that he personally viewed the video for the first time on April 26, 2016, in preparation for trial. The Commonwealth's Attorney estimated that twenty-five people have viewed the video.

Both Superintendent Raley and Principal Saeler understood that the school administration and law enforcement officers would continue to collaborate and communicate on this matter. The Sheriff facilitated access to the video on several occasions, with Superintendent Raley viewing the video at least four times and Principal Saeler viewing the video, or portions of it, at least five times. The video was often viewed to aid in the interview process, as it was viewed before and after student interviews.

The misconduct shown on the video triggered certain provisions within the School Board policy entitled "Prohibition Against Harassment and Retaliation," Pl.'s Ex. 2, which require investigation of allegations of harassment, including sexual harassment. Consequently, Linda Hodges, the school division's Title IX investigator, became involved. The Title IX investigation ended in early March and culminated in a report (the Report) written by Kate Fitzgerald, another Title IX investigator. See Pl.'s Ex. 3. This report was shared with several individuals.

Some families challenged the accuracy of the Report and school officials' interpretations of the video. As a result, the Title IX investigator re-examined the video footage. This culminated in a Supplemental Report. See Pl.'s Ex. 4. This Supplemental Report was also shared with the involved students and their parents, who again challenged the Title IX investigator's findings. Many requested or demanded to see the video.

As a result of the school administration's investigation and the Title IX reports, Superintendent Raley made the decision to recommend expulsion of three students. He also imposed long-term suspensions on three other students. Two additional students were found in violation of Title IX and will need to complete certain "remedies." Of these eight students, the three with expulsion recommendations must be heard by the School Board, and three others have appealed to the School Board.

Hearings on the recommendations for expulsion were initially scheduled for March 31, 2016. A hearing on an appeal of a long-term suspension was also scheduled for that date. The appeals of the Title IX violations were scheduled for April 14, 2016. These hearings are closed and confidential, and pursuant to the Federal Educational Rights and Privacy Act (FERPA), the matters are not to be discussed outside of the closed session. In any subsequent open sessions, the School Board employs "student identifiers" in an effort to protect confidentiality.

Only the School Board conducts expulsion hearings and appeals of other disciplinary actions. However, the School Board members, including the Chair, have yet to view the video. The members feel that they must see the video in order to fully analyze the Superintendent's disciplinary recommendations and provide a fair opportunity to the students involved.

The school administration contacted the Sheriff's office on multiple occasions, making their need to view the video known. This includes a March 16, 2016, email and March 18, 2016, letter from Superintendent Raley, as well as a March 21, 2016, letter from Karen Whetzel, Chair of the School Board. See Pl.'s Exs. 5-7. As this correspondence makes clear, only the relevant portions of the video, ranging from less than a minute to roughly eight minutes, need to be shown at the hearings.

The Sheriff's department refused to make the video available, but offered instead 40,000 still image photographs from the video. However, the School Board felt that it needed to view the video at the proceedings, in an effort

to afford the students and their parents a fair hearing. Consequently, the School Board passed a Resolution, dated March 22, 2016, reiterating the School Board's need to see the video. See Pl.'s Ex. 8. A similar Supplement Resolution was passed on April 11, 2016. See Pl.'s Ex. 9.

Because the Sheriff refused to make the video available for viewing, the School Board postponed the March 31, 2016, and April 14, 2016, hearings. Principal Saeler testified that the postponement caused anger, frustration, and confusion within the school community, which he described as a "continuing harm." Superintendent Raley testified that the only way to know when the students could return to school is to conduct the hearings. He also explained that the hearings are "an important part of the process," referring to the opportunity to implement procedures that can prevent similar future incidents.

The School Board seeks an injunction and a Writ of Mandamus ordering the Sheriff to present the video, or portions of the video, during the closed disciplinary hearings. The Sheriff argues that, under Virginia Code §§ 16.1-301 and 16.1-309, he cannot release the video, and he disputes that the School Board is entitled to the relief sought.

## Injunctive Relief

To obtain injunctive relief, the School Board must prove that it lacks an adequate remedy at law and is likely to suffer irreparable harm. See *Black & White Cars v. Groome Transp.*, 247 Va. 426, 431, 442 S.E.2d 391 (1994) (citing *Wright v. Castles*, 232 Va. 218, 224, 349 S.E.2d 125 (1986)). Additionally, the Court must consider whether the Sheriff's hardship in complying with the injunction outweighs the benefit received by the School Board. See *Mobley v. Saponi Corp.*, 215 Va. 643, 645, 212 S.E.2d 287 (1975); *Akers v. Mathieson Alkali Works*, 151 Va. 1, 8-10, 144 S.E. 492 (1928). On this issue, the Sheriff argues that the School Board is unlikely to succeed on the merits, an adequate remedy at law exists, and the School Board will not suffer irreparable harm.

### A. *Likelihood of Success on the Merits*

Although the parties' pleadings addressed the School Board's likelihood of success on the merits, all parties agreed to proceed to a trial on the merits if the Court overruled the Demurrer. Thus, while most petitioners must prove a likelihood of success on the merits in a temporary injunction proceeding, there is no future case in which the School Board can or must prevail. Instead, this proceeding is the one in which the School Board must succeed on the merits. Consequently, the Court need not address this element.

## B. *Adequate Remedy at Law*

To prevail on a Motion for Injunction, the petitioner must lack a "complete and adequate" remedy at law. See *Thompson v. Smith*, 155 Va. 367, 386-87, 154 S.E. 579 (1930). The Sheriff argues that the School Board may file a warrant in detinue to reclaim its property, if it was, in fact, wrongfully taken or withheld. However, detinue requires either the return of the personal property or damages if the property cannot be returned. See *Macpherson v. Green*, 197 Va. 27, 32, 87 S.E.2d 785 (1955) (citations omitted). In this case, the School Board does not seek to recover the video, but only asks that it be made available for viewing at the disciplinary hearings. The School Board does not seek nor want to recover the video or otherwise affect its use in criminal proceedings. Thus, an action in detinue to recover the video fails to address the School Board's limited need, and it is, therefore, inadequate.

## C. *Irreparable Harm*

The School Board contends that irreparable harm is likely to result based on obligations arising under three sources of law. First, the School Board looks to the supervisory powers vested in it by Article VIII, § 7, of the Virginia Constitution. It argues that a "manifest part" of this supervisory role includes the power to make decisions regarding the safety and welfare of the students, as well as decisions about discipline. Next, the School Board points to its federal obligations under FERPA, Title IX, and the Due Process Clause. It argues that these federal obligations require the School Board to remedy any harassment and address its effects, and, in doing so, to provide the students adequate notice and opportunity to respond. Lastly, the School Board cites to case law, particularly *Commonwealth v. Doe*, 278 Va. 223, 682 S.E.2d 906 (2009), for the proposition that any statutes that might limit the School Board's supervisory role must be read in the "shadow" of Article VIII, § 7. In sum, the School Board reasons that it will suffer irreparable harm if it is unable to fulfill its duties under these various sources of law. For example, if the School Board cannot conduct the necessary hearings, it will not be able to fully address the incidents and will fail in its obligations to remedy the harassment. If it conducts the hearings without the video, it deprives the students and families of a fair opportunity to respond to the evidence against them.

The Sheriff, on the other hand, insists that the School Board possesses the evidence necessary to conduct the disciplinary proceedings. He denies the necessity of the video and instead points to other evidence that the School Board may use at its hearings. This evidence includes the Title IX investigator's report, Pl.'s Ex. 3, as well as testimony from eye-witnesses and those individuals that have already viewed the video, *i.e.,* the superintendent, principal, and Title IX investigator. In the Sheriff's view,

the School Board may conduct the hearings and fulfill its obligations using this evidence.

The Sheriff also argues that he lacks authority to relinquish the video and, under Virginia Code §§ 16.1-301 and 16.1-309, he is prohibited from doing so, He relies specifically on § 16.1-301(A), which states in part: "The court shall require all law-enforcement agencies to take special precautions to ensure that law-enforcement records concerning a juvenile are protected against disclosure to any unauthorized person." Section 16.1-309(A) makes certain disclosures a Class 3 misdemeanor.

The School Board's reasoning on this point is sound. Article VIII, § 7, vests in the School Board a supervisory power, and pursuant to this power, the School Board holds the authority to monitor and manage the safety and welfare of its students. In doing so, it may find it necessary to discipline certain students in an effort to address certain incidents, but also to deter future conduct that may threaten the safety and welfare of the students or otherwise interrupt the educational process. Accordingly, the School Board may make decisions about how to best conduct these hearings, including deciding what evidence is necessary and how to best protect the rights of the students and the institution.

The Sheriff's reliance on §§ 16.1-301 and 16.1-309 overlooks § 16.1-301(C)(3), which allows for inspection of juvenile records by any "person, agency, or institution, by order of the court, having a legitimate interest in the case or in the work of the law-enforcement agency." Additionally, § 16.1-309(B) creates an exemption for certain disclosures, specifically disclosures of identifying information made to school personnel for purposes of enabling the school personnel to take disciplinary action. When these provisions are read in light of the supervisory power provided by Article VIII, § 7, they do not act to limit the School Board's authority or duties; rather, they reiterate the School Board's authority, as an institution with a legitimate interest, to investigate and discipline its juvenile students. It would appear that the School Board would be an institution with a legitimate interest in the video and that, through either a court order granting injunctive relief or independently through their constitutional authority, its access to the video should not be barred by § 16.1-301.

Furthermore, I find that there is no substitute for this video. The evidence demonstrates that the video is subject to various interpretations, and some parents question the interpretations of the superintendent, principal, and Title IX investigator. These parents demand to see the video, apparently believing that it may contain exculpatory evidence. No other piece of evidence can adequately address their concerns. A disciplinary hearing held without access to the relevant portions of the video would be unsatisfactory, as many parents and students would leave with a feeling that the School Board is hiding important information. To deny the School Board access to this video footage, even in a controlled and confidential setting as explained

above, unreasonably interferes with the Board's constitutionally-mandated duties, which includes the obligation to conduct these disciplinary proceedings.

Accordingly, based on the reasons listed above, I find that the School Board is likely to suffer irreparable harm in the absence of an injunction.

## D. *Balancing of Equities*

In considering injunctive relief, the Court should consider whether "the hardship to the defendant or to the public is disproportionate to the injury to the plaintiff." *Mobley*, 215 Va. at 645 (citation omitted). The Sheriff did not challenge this element of injunctive relief, and I find that it has clearly been demonstrated. For example, in the absence of an injunction, the School Board must continue to delay the disciplinary proceedings. This impinges on the duty of the School Board to address safety concerns, prevent future incidents, and create a safe and stable learning environment. While the School Board remains unable to address the incidents, the educational environment continues to suffer, as students are distracted, angry, and frustrated by these ongoing events. In the alternative, the School Board could conduct the proceedings without the video, but at the risk of making an ill-informed decision and triggering multiple due process claims.

On the other hand, if the Court grants the injunction, the Sheriff suffers no prejudice or injury. Although it has been asserted that the disclosure could affect or impede an ongoing criminal investigation, the only facts presented to support this argument were that the Commonwealth's Attorney does not like to be surprised and that the investigators want the identity of two eyewitnesses to potential felony activity. Accordingly, I cannot find that the investigation is impeded by the School Board's request for a limited and confidential viewing.

Additionally, I infer that much of the Sheriff's concern stems from an obligation to keep the original video unadulterated. However, the original video has been secured in the Sheriff's evidence locker since the school administrators first turned it over. When the superintendent, principal, or others needed to see the video, a copy was used. Additionally, a copy was provided to the Commonwealth's Attorney, and another "working copy" was provided to Investigator Paul Taylor for the purposes of capturing still images. Similarly, a copy can be used at the disciplinary hearings, and a Sheriff's deputy would be present during the viewing, obviating any perceived fear of adulteration or contamination. The Sheriff conceded that the video would not be adulterated as a result of the limited and controlled viewing requested by the School Board.

Furthermore, I find no merit in the argument that the viewing disregards the Sheriff's obligations to keep juvenile records confidential. The School Board hearings will be closed and confidential. Only necessary parties, such as the students, their parents, and the relevant school administrators

will be present. Additionally, under FERPA, those parties are prohibited from discussing the proceedings. Accordingly, I find that the balance of the equities tips in favor of the School Board.

The facts lead the Court to further conclude that, on January 12, 2016, the school officials and law enforcement officers understood that the video was clearly the property of the school system, but that it may also be evidence in criminal investigations and prosecutions. I conclude that, when the original copy of the video was entrusted to the care and custody of law enforcement, preserving its evidentiary integrity, both law enforcement and the school officials understood that the school system needed and retained the right to use the video in performing its duties. This agreement is further evidenced by the subsequent full cooperation of the Sheriff in providing viewing opportunities to school officials, until this current falling out. Now, the School Board asserts a need and right to use the video. The Court is affording them access to their property, in a controlled and confidential setting, in a manner that recognized the Sheriff's need to preserve evidentiary integrity.

Accordingly, I grant Petitioner's Motion for Injunctive Relief and direct the Sheriff to make the video available and to show it to the School Board, at the times determined by the School Board Chair, in the presence of the parents and the students at the upcoming School Board disciplinary hearings, in closed session. The Sheriff will provide a deputy to go into the closed hearing, play the requested portions of the video, and then leave the hearing with the video. The assisting deputy will not be present during any other portions of the closed hearings. No bond is required, as the Sheriff maintains possession of the video.

### Mandamus

A Writ of Mandamus "is an extraordinary remedy employed to compel a public official to perform a purely ministerial duty imposed upon him by law." *Richlands Medical Ass'n v. Commonwealth, ex rel. State Health Comm'r,* 230 Va. 384, 386, 337 S.E.2d 737 (1985) (citation omitted). The Virginia Supreme Court has defined a ministerial act as "one which a person performs in a given state of facts and prescribed manner in obedience to the mandate of legal authority without regard to, or the exercise of, his own judgment upon the propriety of the act being done." *Id.* (quoting *Dovel v. Bertram,* 184 Va. 19, 22, 34 S.E.2d 369 (1945)). Once the Commonwealth's Attorney directed the Sheriff to withhold the video and advised him of the ongoing or anticipated prosecutions, the release of the video was not a simple ministerial act as contemplated by a Writ of Mandamus. The Commonwealth's Attorney's position has not changed. Accordingly, the Petition for a Writ of Mandamus is denied, and the relief granted herein is on the Petition for injunctive relief.

*Conclusion*

I grant Petitioner's Motion for Injunctive Relief, subject to the limitations noted above, and deny the Petition for a Writ of Mandamus.