COURT OF APPEALS OF VIRGINIA

Present: Judges Chaney, Callins and Senior Judge Humphreys
Argued at Leesburg, Virginia

PUBLISHED

BISTRO MANILA, LLC, ET AL.

OPINION BY
JUDGE DOMINIQUE A. CALLINS

v.      Record No. 0463-23-4                           JANUARY 7, 2025

ALVAH I, LLC, ET AL.

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
J. Bruce Strickland, Judge

Andrew C. Bisulca; Timothy J. McGary (Law Office of Andrew C.
Bisulca, P.C., on briefs), for appellants.

George LeRoy Moran (Moran Law, P.L.C., on brief), for appellees.


Appellants Bistro Manila, LLC, Vincent Elegido, Romichelle Elegido, Beverly Escueta, and

Eric Escueta (collectively "Bistro Manila") appeal the circuit court's judgment finding them in

breach of a commercial lease agreement ("Lease") and awarding appellees Alvah I, LLC and Alvah

II, LLC (collectively "Alvah") $410,391.77 in damages and $18,000 in attorney fees. Bistro Manila

challenges the circuit court's findings that Alvah had no duty to mitigate its damages and that it was

entitled to accelerated rent. Finding no error, we affirm.

## BACKGROUND[1]

In September 2020, Bistro Manila entered into a commercial lease agreement and guaranty agreement for a unit in Alvah's commercial shopping center where Bistro Manila was to operate a restaurant. The Lease term ran until July 31, 2028. Under the Lease, Alvah retained the right to declare Bistro Manila in default upon nonpayment of rent or abandonment of the premises. The Lease also contained an acceleration provision providing that upon default, "the total amount of the rent payable during the Term of th[e] Lease, discounted to present value . . . at the rate of four percent (4%) per annum, shall immediately become due and payable" at Alvah's option. "Upon reletting the property, any rent [Alvah] received would be applied first to paying any debts other than [Bistro Manila's] unpaid rent, then to costs and expenses of reletting, and last to paying any unpaid portion of [Bistro Manila's] accelerated rent." Alvah could "terminate the lease, with or without re-entering the premises, or, without terminating the lease, relet the premises for the benefit of" Bistro Manila.

Bistro Manila closed the restaurant in January 2022 due to the impact of the COVID-19 pandemic, having paid rent through February 2022. On March 9, 2022, Alvah noticed Bistro Manila "to pay their unpaid rent, or otherwise vacate the premises." Bistro Manila then abandoned the property. Bistro Manila contends that it offered Alvah a substitute tenant shortly after vacating

---

[1] We "view the evidence and all reasonable inferences drawn from it in the light most favorable to . . . the prevailing party at trial." *Moncrieffe v. Deno*, 76 Va. App. 488, 496 (2023) (quoting *Palmer v. R.A. Yancey Lumber Corp.*, 294 Va. 140, 159 (2017)). Likewise, in reviewing a damages award, we "view the evidence in the light most favorable to the prevailing party below, in this case, the appellee." *City-to-City Auto Sales, LLC v. Harris*, 78 Va. App. 334, 348 (2023).

the property but that its offer went unanswered. Bistro Manila paid no rent after February 2022.[2]

Alvah sued to enforce the acceleration provision and collect all the rent due for the lease term.

The trial court held that Alvah had "no duty to mitigate damages in Virginia for a commercial lease . . . [and] that the rent acceleration clause, viewed []holistically, is not an unenforceable penalty." The court awarded Alvah $410,391.77 in damages and $18,000 in attorney fees, with the proviso that, "[s]hould [Alvah] relet the property for any duration within the original lease term, the remaining balance of the judgment against [Bistro Manila] shall be credited the full value of that rent amount as an offset." Following entry of a judgment order on February 15, 2023, Alvah moved to stay the proceedings, for clarification and for bond increase. After granting Alvah's motion to stay the proceedings and entering a suspending order, the trial court heard arguments regarding Alvah's motions for clarification and for bond increase. The court granted both motions on April 14, 2023. In so doing, however, the court did not include language in its orders confirming the initial February 15, 2023 judgment order.

## ANALYSIS

### I. Jurisdiction

"It is a familiar principle that a 'court always has jurisdiction to determine its own jurisdiction.'" *CVAS 2, LLC v. City of Fredericksburg*, 289 Va. 100, 108 (2015) (quoting *Rutter v. Oakwood Living Ctrs. of Va., Inc.*, 282 Va. 4, 13 (2011)). "Before the merits of this case can be considered, [this Court] must determine whether it has jurisdiction." *Comcast of Chesterfield Cnty., Inc. v. Bd. of Supervisors*, 277 Va. 293, 299 (2009) (quoting *Madison v. Kroger Grocery & Bakery Co.*, 160 Va. 303, 306 (1933)). Code § 17.1-405(A)(3) sets this Court's jurisdictional limits in civil

---

[2] At trial, the court confirmed, "so [Bistro Manila's] concession is that the last rent payment pursuant to the lease, that you agree was validly signed and executed by the parties, as well as the guarant[y], the last rent payment under the terms of that was February of 2022?" Counsel for Bistro Manila responded, "Correct."

matters, giving this Court subject matter jurisdiction over cases appealed from "any final judgment, order, or decree of a circuit court," with certain exceptions. *See* Code § 17.1-406(B) (excising certain civil matters from this Court's jurisdiction under Code § 17.1-405(A)(3)). It is well-established that "a final judgment is one which disposes of the entire action and leaves nothing to be done except the ministerial superintendence of execution of the judgment." *Super Fresh Food Mkts. of Va. v. Ruffin*, 263 Va. 555, 560 (2002).

"[U]nder Rule 1:1, 'final judgments . . . remain under the control of the trial court and [may] be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer." *Id.* (quoting Rule 1:1). But our Supreme Court has "stress[ed] that a judgment which has been properly vacated or suspended under Rule 1:1 does not become a final judgment thereafter without a *subsequent order confirming* it as originally entered or as modified." *Id.* at 564 (emphasis added).

Here, the trial court entered its final order on February 15, 2023. On March 3, 2023, Alvah moved for a bond increase and clarification, and asked that the trial court stay the proceedings. On March 6, 2023, the trial court granted Alvah's motion to stay the proceedings and entered a suspending order, suspending the "Expiration of the Court[']s Jurisdiction . . . until the 28 [sic] day of April, 2023 to enable the Court to hear argument of [Alvah]'s Motion for Bond Increase and its Motion for Clarification." In addition, the trial court's suspending order, in granting Alvah's motion to stay, characterized Alvah's motion as a "Motion to Stay of Proceedings and Suspend the 21 days for finality of the Judgment."[3]

At an April 14, 2023 hearing, the trial court heard arguments regarding Alvah's motions for a bond increase and clarification. As the hearing drew to a close, the following exchange took place between the trial court and the parties' counsel:

---

[3] The motion Alvah filed with the circuit court carried a simpler title: "Motion for Stay of Proceedings."

[Bistro Manila]: Your Honor, I would think that the order, since we have a suspended order, I don't quite know how we address that. But the order should also have language in it terminating the suspension, as of—

[Trial Court]: Yeah. I think I put a date in there, in that original order, so we could have those motions. I want to say it was the end of April. I agree that at this point there's no other matters that need to be—there's no reason it should be stayed anymore, is there, Mr. Moran?

[Alvah]: No, Your Honor.

[Trial Court]: All right. So then just put that language in one of the orders today and that way it will be clear on that.

Counsel handed up two proposed orders adjudicating the pending motions that the trial court entered. Neither order, however, included the requested language. Rather, the bond order only reflected an upward adjustment in the bond amount, and the clarification order included no language confirming the trial court's earlier final order as originally entered, releasing the suspension, or otherwise referencing the February 15, 2023 order.[4]

The question we must answer on appellate review is whether (1) even in the absence of such language confirming the final order as originally entered, the expiration contained in the circuit court's suspending order was self-executing, and so, (2) according to the terms of the suspending order, the circuit court's February 15, 2023 final order went into effect and the jurisdictional timer on its finality resumed on April 28, 2023.[5] We hold that it was and it did.

_____

[4] The clarification order does state, "The Court finds, as it did previously, those terms were negotiated and the parties are bound by the provisions as written therein."

[5] As discussed, the circuit court entered its final order on February 15, 2023. The court suspended its final order on March 6, 2023, two days prior to the expiration of its jurisdiction. Rule 1:1(a) ("All final judgments, orders, and decrees . . . remain under the control of the trial court and may be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer."). By its own terms, the circuit court's suspension of the finality of its judgment stayed in effect "until the 28 [sic] day of April, 2023." After the entry of the suspending order, the court issued orders adjudicating the pending motions for clarification and for bond increase

*Hutchins v. Talbert*, 278 Va. 650 (2009), serves as an instructive comparator case. In *Hutchins*, the circuit court entered a suspending order stating, "It is ORDERED that the final Order be suspended for fourteen . . . days from this date. This tolls the running of the twenty-one . . . day provision in Rule 1:1, thus allowing a total of thirty-five . . . days for entry of an Amended Final Order." *Id.* at 652. Subsequently, the circuit court entered an order addressing a motion to set aside the verdict. In so doing, "it d[id] not refer to the final order in any manner." *Id.* at 652-53. The Supreme Court found that "[t]he fourteen day time period set forth in the suspending order . . . was self-executing, expiring by the terms of the order on May 9, 2008," and thus, "[w]hen the suspension expired on May 9, 2008, the final order took effect." *Id.* at 654.[6]

<hr />

on April 14, 2023. In the interim, Bistro Manila, Vincent Elegido, and Romichelle Elegido filed their notice of appeal on March 15, 2023, Beverly Escueta and Eric Escueta filed their notice of appeal on April 27, 2023. Since the jurisdictional timer did not restart until April 28, 2023, all parties timely filed their notices of appeal. *See* Rule 5A:6(a1) ("No new notice of appeal is required . . . for a prior final judgment that was merely suspended or modified, but not vacated."); *Saunders v. Commonwealth*, 12 Va. App. 154, 155 (1991) ("The premature notice of appeal filed after oral pronouncement of judgment became effective when the final order was written and entered by the court.").

[6] Similarly, in *Wagner v. Shird*, 257 Va. 584 (1999), which predates *Hutchins*, the circuit court entered a suspending order stating, "the Order of Final Judgment . . . is stayed or suspended for a period of 30 days for argument and decision upon [appellee's] Motion for Remittitur." *Id.* at 586. After a hearing, the circuit court stated its decision from the bench, but entered a written order after the 30-day suspension period had passed. *Id.* The Supreme Court found that the original judgment order became final 30 days after its suspension and that the later order entered after the 30-day period had passed was a nullity. *Id.* at 587-88.

We further find persuasive an unpublished case of this Court, *Pederson v. Pederson*, Nos. 1178-15-4 and 2093-15-4 (Va. Ct. App. Aug. 2, 2016) (Russell, J.). In *Pederson*, the circuit court entered a suspending order stating, "THIS MATTER comes before the [c]ourt upon [wife's] Motion to Reconsider the final order . . . . IT IS ORDERED the June 30, 2015 order be suspended until further order of this [c]ourt." *Id.*, slip op. at 8 (first, second, and fourth alterations in original). At the close of the hearing that followed, the circuit court stated from the bench that "the motion to reconsider is denied. The Order of June 30 remains in full force and effect," and on the same day, entered an order stating,

> This matter came to be heard on the 17th day of July 2015[,] on [wife's] motion to Reconsider the Court's ruling of May 15, 2015 as reflected in the Court's order entered June 30, 2015. Upon the

*Hutchins* cautions against the rote application of the rule that "a judgment which has been properly vacated or suspended under Rule 1:1 does not become a final judgment thereafter without a subsequent order confirming it as originally entered or as modified." *Super Fresh*, 263 Va. at 564. The *Hutchins* Court urges us to look to the language of the suspending order, and the terms under which the final order was suspended, in evaluating whether a subsequent order is needed to confirm the final order as originally entered.[7] *Cf. Russell v. Commonwealth*, 79 Va. App. 618, 625 (2024) ("Rule 1:1 does not require incantation; it requires specificity.").

Here, the trial court included in its suspending order the following language: "ORDERED that Expiration of the Court[']s Jurisdiction is suspended until the 28 [sic] day of April, 2023 to enable the Court to hear argument of [Alvah]'s Motion for Bond Increase and its Motion for Clarification." The suspending order, therefore, made clear that the trial court (i) intended to suspend the expiration of its jurisdiction—and thereby its final order—for the exclusive purpose of hearing argument regarding Alvah's two motions, and, notably, (ii) would *lose* jurisdiction over the matter on or shortly after April 28, 2023. In other words, the trial court tolled the expiration of its jurisdiction for the stated time period. And, as in *Hutchins*, the time period delineated in the suspending order was self-executing; after this period passed, the trial court lost jurisdiction over the matter *and its previously entered final order*, leaving the final order to take effect. And although the

---

matters presented to the Court it is hereby ORDERED as follows:
Thus, the Motion to reconsider is denied.

*Id.* (alterations in original).

This Court reasoned that "[a]lthough the [latter] order denying the motion to reconsider does not 'clearly and expressly' lift the suspension, said order, when read in conjunction with the . . . suspending order, is sufficient to reinstate the June 30, 2015 order as a final order." *Id.* at 13.

[7] Put differently, *Hutchins* offers leniency insofar as when an order suspending a final judgment is entered and provides for its expiration on a specific date, or after a specific condition is met, no such subsequent order is needed to confirm the finality of the original order. Conversely, a subsequent order confirming the finality of the original order would be necessary if the final judgment was suspended for an *indefinite* period of time.

trial court purported to suspend its jurisdiction, the self-executing terms of the order were such that the effect was the same as that in *Hutchins*. *Cf.* Rule 1:1(a) ("All final . . . orders . . . remain under the control of the trial court and may be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer.").

Accordingly, we have jurisdiction over this matter, with the trial court's final order having taken effect upon expiration of the suspension.

## II.  Standard of Review

"A lease is a contract and 'when the terms of a contract are clear and unambiguous, a court must give them their plain meaning.'" *Landmark HHH, LLC v. Gi Hwa Park*, 277 Va. 50, 55 (2009) (quoting *Levisa Coal Co. v. Consolidation Coal Co.*, 276 Va. 44, 57 (2008)).  "On appeal, we review a trial court's interpretation of a lease under a de novo standard." *Id.* (quoting *Levisa Coal*, 276 Va. at 57).

"Whether a contractual provision creates a legally enforceable obligation is a question of law we review de novo." *CGI Fed., Inc. v. FCi Fed., Inc.*, 295 Va. 506, 515 (2018).  "The measure of damages available for a cause of action is a question of law subject to de novo review." *Id.* at 517.  In reviewing a damages award, "courts view the evidence in the light most favorable to the prevailing party below, in this case, the appellee." *City-to-City Auto Sales, LLC v. Harris*, 78 Va. App. 334, 348 (2023).

Further, "to the extent this appeal requires interpretation of the common law . . . it presents a question of law this Court reviews de novo." *Kilpatrick v. Commonwealth*, 73 Va. App. 172, 187 (2021).  And although "[w]e . . . review the circuit court's application of law to undisputed facts de novo," "[t]he circuit court's findings of fact . . . will not be disturbed unless they are plainly wrong or without supporting evidence." *Chamberlain v. Marshall Auto & Truck Ctr., Inc.*, 293 Va. 238, 242 (2017).

III.  Mitigation of Damages

At common law, a commercial landlord "[i]s under no obligation to resume possession of . . . premises which h[ave] been wrongfully abandoned, and h[as] the right to refuse such possession and to hold the tenant liable under the contract." *Crowder v. Virginian Bank of Com.*, 127 Va. 299, 304-05 (1920); *see also tenBraak v. Waffle Shops, Inc.*, 542 F.2d 919, 924 (4th Cir. 1976) ("[W]hen a tenant abandons leased property during the term, the Supreme Court of Appeals of Virginia has held that the landlord is permitted, at his option, either (1) to refuse to accept the tenant's surrender, do nothing and sue for accrued rents, or (2) to re-enter the premises and accept the tenant's surrender, thereby terminating the lease and releasing the tenant from further liability on the lease.").  In other words, the common law imposes on commercial landlords no duty to mitigate damages by reletting a rental property that has been abandoned.  Indeed, because at common law a "landlord had no right . . . to re-enter the leased premises" following a tenant's default "upon the payment of rent," "he could neither act to terminate the lease nor mitigate his lessee's damages." *tenBraak*, 542 F.2d at 923.  Hence, a landlord's "only remedy" under the common law "was to initiate an action, on the basis of his contract, to recover the full amount of the accrued rents." *Id.* at 923-24.

Bistro Manila argues that here the landlord tacked a different course.  Bistro Manila contends that, rather than "wait[ing] and collect[ing] rent as it become[s] due" or "displac[ing] the tenant," Alvah "assert[ed] a *contract* remedy [i.e., acceleration of rent] . . . that is only available to the landlord by virtue of the contract (lease) and is not found in property law or the common law." (Emphasis added).  By bringing such an action for accelerated rent, Bistro Manila asserts Alvah sought a "remedy . . . exclusively in contract and incompatible with common law/property remedies."  And this choice, Bistro Manila argues, is not without consequences.  Specifically, Bistro Manila argues that Alvah, "like any other party to a contract, has the duty to mitigate damages."

*See, e.g.*, *Moon v. Washington-Beaufort Land Co.*, 147 Va. 912, 917 (1926) (quoting *Stonega Coke & Coal Co. v. Addington*, 112 Va. 807, 813 (1911)) ("Where a party is entitled to the benefit of a contract, and can save himself from loss arising from a breach of it at a trifling expense or with reasonable exertions, it is his duty to do it, and he can charge the delinquent with such damages only as with reasonable endeavors and expense he could not prevent."). To relieve Alvah of this duty, Bistro Manila seems to assert, would permit Alvah to use the common law as a convenient shield, while simultaneously seeking contract remedies found nowhere in the common law. In other words, Bistro Manila's arguments sum to the claim that relieving Alvah of the duty to mitigate damages, despite Alvah having availed itself of a contract remedy, would permit Alvah to have its cake and eat it too.

Moreover, Bistro Manila contends that "requiring a landlord who elects to pursue a contractual remedy and contract damages and forego the remedies under property law or the common law to mitigate damages is not unique." Bistro Manila argues that "[o]ther courts have recognized the logic in this approach," and asks this Court to do the same. *See Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*, 948 S.W.2d 293, 296 (Tex. 1997) ("Some Texas courts have . . . required a landlord to mitigate damages when the landlord seeks a remedy that is contractual in nature, such as anticipatory breach of a contract, rather than a real property cause of action.") (codified at Tex. Prop. Code § 91.006).

Yet as we note, under established Virginia law, there is no duty for a landlord to mitigate damages under a commercial lease where a tenant abandons a property. Under common law, such a landlord may decline to relet the property altogether and hold the tenant liable for accrued rents. *See Crowder*, 127 Va. at 304-05. Nevertheless, *Crowder* does not, by its explicit terms, contemplate the present circumstance, where a commercial tenant abandoned a property, and the

landlord sought damages with respect to a lease's acceleration provision. Even so, *Crowder* and the common-law mitigation-of-damages rule control.

The General Assembly has taken no steps to abrogate the common-law[8] status-quo arrangement that prevails in Virginia regarding the duty of landlords to mitigate damages where a tenant abandons a nonresidential rental property. *See Poole v. Commonwealth*, 73 Va. App. 357, 366 (2021) ("The common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and the Constitution of this Commonwealth, shall continue in full force within the same, and be the rule of decision, *except as altered by the General Assembly*." (quoting Code § 1-200)). To the contrary, this common-law principle is operative within Virginia statutes. Specifically, Code § 55.1-1414 provides that where a tenant owing rent abandons a nonresidential rental property and certain other conditions are met, "the lessor shall be entitled to possession of the premises and *may*

---

[8] Such common-law principles evolved within, and emerged out of, post-feudal land arrangements, made possible by changes in labor dynamics engendered by the Black Plague and resulting shifts in population. Bridget M. Fuselier, *Definition and Acquiring Interests in Property* 133-34 (3d ed. 2023), explains,

> Landlord-tenant law originated with English common law principles established during the post-feudal era. Under this approach a lease was seen as a conveyance of a nonfreehold or a "leasehold" estate. The lands of the nobility and gentry were cultivated by landless serfs that had arrangements that differed very little from slavery. When the Black Plague decimated the supply of labor, the lords had to offer more attractive agreements to have labor to work their land. This evolved into a rudimentary lease, where the former serf was allowed to use a particular tract of land for an agreed-upon term in exchange for a fixed rent. This gradually gave way to the landlord[-]tenant relationship.

Such "relationship really began more as a commercial lease rather than a residential lease, because the agreements during the medieval times were for farming land," and "[b]y 1500, this type of arrangement was well solidified and molded to fit the farm lease situation. The lease was viewed as a conveyance of an estate in land and was governed by property law rather than contract law principles. However, what this meant was that under common law," among other things, "the landlord had no duty to mitigate damages if the tenant abandoned the premises." *Id.* at 134.

enter the premises." (Emphasis added). Thus, Code § 55.1-1414, by implication, acknowledges that a lessor may also choose *not* to enter the premises following a tenant's abandonment of a nonresidential rental property. *See Sauder v. Ferguson*, 289 Va. 449, 457 (2015) ("We will apply the ordinary meaning of the word 'may' in construing a statute unless a contrary legislative intention plainly appears."). Put differently, Code § 55.1-1414 assumes, rather than abrogates, the common-law principle regarding a landlord's duty to mitigate where a tenant abandons a nonresidential rental property.

What is more, no Virginia appellate court has held as Bistro Manila urges—that a commercial landlord's choice to seek contractual remedies is determinative of whether they owe a duty to mitigate. And this Court will not be the first to announce such a rule; doing so would involve bringing into existence by judicial fiat a duty that our legislature has declined to recognize. Further, although, as observed *supra*, *Crowder* does not address the specific legal question at issue here, we are nonetheless bound by its holding that landlords owe no duty to mitigate damages upon a commercial tenant's abandonment of premises before the end of a lease.

Here, Bistro Manila abandoned the property. Indeed, Bistro Manila conceded at trial to have only paid rent through the conclusion of February 2022 and that they "vacated the premises or were no longer at the premise after they received that pay or quit notice." *See tenBraak*, 542 F.2d at 924 n.5 ("[A]n 'abandonment' of a lease occurs when the lessee leaves the premises vacant with the avowed intention not to pay rent."). On this basis, the circuit court found that Bistro Manila abandoned the property, and its finding was not plainly wrong. *See Chamberlain*, 293 Va. at 242 ("The circuit court's findings of fact . . . will not be disturbed unless they are plainly wrong or without supporting evidence."). As such, this "finding[] of historical fact [is] binding on appeal."

*Hollowell v. Va. Marine Res. Comm'n*, 56 Va. App. 70, 83 (2010) (quoting *Dep't of Med.*

*Assistance Servs. v. Beverly Healthcare of Fredericksburg*, 41 Va. App. 468, 490 (2003)).[9]

With Bistro Manila having abandoned the rental property, Alvah owed no duty, at common

law, to mitigate damages by reletting the abandoned property. What is more, this long-established

principle of common law was reflected in the text of the Lease Bistro Manila signed when it rented

the property. The Lease, in § 26(e), provides,

> Landlord *may also*, *at its option*, upon occurrence of any event of
> default hereunder, terminate this Lease, with or without re-entering
> the Leased Premises, or, without terminating this Lease, *relet the
> Leased Premises or any part thereof*, for the benefit of Tenant, for
> such term or terms (whether shorter or longer than the Term of this
> Lease) and at such rent or rents and upon such other terms and
> conditions as Landlord, in its sole discretion, deems advisable, and at
> the expense of Tenant, Landlord shall have the right to make such
> repairs or alterations to the Leased Premises as Landlord deems
> necessary in order to relet the Leased Premises.

(Emphases added). The emphasized discretionary terms of § 26(e) make clear that Alvah had

available to it the option to relet, *or not* relet, the property for Bistro Manila's benefit. Thus, the

terms of the Lease expressly contemplate and answer the very question Bistro Manila raises now on

appeal: the Lease delineates that, in the event of a "default," Alvah owed no mandatory duty to

---

[9] Nevertheless, Bistro Manila maintains that it "constructively surrend[ered] possession to the Landlord" and that "in this matter, the Landlord, by the sending of the 'pay or quit' notice elected to terminate the possession and thereby the tenancy of Tenant. Once that occurred, the Landlord no longer had a claim under common law or property law but was left with a contract claim alone." However, this argument runs headlong into the circuit court's finding that Bistro Manila abandoned the property. Further, it presents circumstances unlike those described in *James v. Kibler's Adm'r*, 94 Va. 165, 174 (1896), where the Supreme Court found "that the relation of landlord and tenant [never] existed between the plaintiffs and defendant," since "[t]he defendant had never taken any possession under his contract, but had broken and abandoned it long before the sale." *See id.* at 174-75 (rejecting the argument that lessors, "in making sale of [a] lease[,] were acting as agents of the lessees . . . and that, inasmuch of one of [the lessors] became the purchaser, it was equivalent to a re-entry on the leased premises by both," thereby limiting them "to recover [nothing] more than the rent due at the time of sale"). Bistro Manila took possession of the property and then subsequently abandoned it, permitting Alvah, qua landlord, to avail itself of "claim[s] under common law or property law."

- 13 -

mitigate damages. And as the subject lease terms are not repugnant to the law, they are binding on Bistro Manila. *Cf. Gordonsville Energy, L.P. v. Va. Elec. & Power Co.*, 257 Va. 344, 355 (1999) ("[I]t is . . . well-settled that a term of the parties' contract becomes the law of the case unless such term is repugnant to public policy or to some rule of law.").

Accordingly, the circuit court did not err in finding that a landlord of a commercial property did not have a duty to mitigate its damages.

## IV. Accelerated Rent and Liquidated Damages

Bistro Manila next argues that, under the Lease, Alvah "could recover the entire balance of the rent from [Bistro Manila] and at the same time relet the premises and collect rent from the new tenant," providing Alvah with a "windfall" by permitting it to "collect double rent." And although Bistro Manila acknowledges that the trial court found that the Lease imposed on Alvah "a duty to credit substitute rent received [subsequent to reletting the property] against the current rental obligation of the former tenant [i.e., Bistro Manila], and apply that obligation to the acceleration of rents," "neither party urged this construction [of the Lease] upon the court," and the Lease provisions upon which the court based its construction, § 26(a) and § 26(e), "govern[] separate contingencies." In sum, Bistro Manila contends that the accelerated rent provision found in the Lease is "an unenforceable penalty."

Our Supreme Court "has recognized that a liquidated damages provision may constitute a penalty and, therefore, be unenforceable when the amount agreed to is 'out of all proportion to the probable loss.'" *Gordonsville Energy*, 257 Va. at 355 (quoting *Brooks v. Bankson*, 248 Va. 197, 208 (1994)). That is, "[s]uch a provision also may constitute an unenforceable penalty if the agreed amount is 'grossly in excess of actual damages.'" *Id.* (quoting *O'Brian v. Langley School*, 256 Va. 547, 551 (1998)). "An agreement between the parties to a contract, fixing the amount to be paid for loss which may result from breach of the contract, [also] will be construed

as a penalty when the damage resulting from a breach of contract is susceptible of definite measurement." *Brooks*, 248 Va. at 208. "However, it is equally well-settled that a term of the parties' contract becomes the law of the case unless such term is repugnant to public policy or to some rule of law." *Gordonsville Energy*, 257 Va. at 355.

Our Supreme Court has not explicitly addressed whether acceleration of rent is a valid liquidated damage or an unenforceable penalty, making this a matter of first impression.[10] The Court has, however, essentially treated some acceleration provisions as enforceable by ruling on leases that included acceleration provisions without finding that those acceleration provisions were unenforceable. *See, e.g.*, *Aiglon Assocs., Ltd. v. Allan*, 248 Va. 150, 152-54 (1994) (finding that a mandatory acceleration provision was only applicable upon termination of lease, without considering whether the provision itself was enforceable); *Va. Dynamics Co. v. Payne*, 244 Va. 314, 316-18 (1992) (holding claim splitting permissible on lease with acceleration clause in unlawful detainer actions, expressly without reviewing enforceability of acceleration provision); *Snyder v. Exum*, 227 Va. 373, 376-78 (1984) (holding that a landlord improperly split claims where all rent became due upon landlord's first suit, expressly without reviewing enforceability of acceleration provision).

---

[10] Virginia has recognized the validity of acceleration clauses in other contexts. *See* Code § 6.2-401(A) ("Any note or other contract evidencing an installment loan or other installment sales obligation with add-on interest may provide that the entire unpaid loan balance, at the option of the holder, shall become due and payable upon default in payment of any installment without impairing the negotiability of the note."); Code § 6.2-1614(5) (prohibiting an acceleration clause that "permit[s] the unpaid balance of a mortgage loan to be declared due for any reason other than failing to make timely payments of interest and principal"); *Devany v. Colgin*, 163 Va. 848, 850 (1935) (noting that "the validity of an acceleration clause in a deed of trust is recognized" by statute); *Fant v. Thomas*, 131 Va. 38, 44 (1921) ("A provision in a contract, not that the amount of the debt shall be increased, but that in a specified event the time for the payment of a certain sum due shall be accelerated, does not create a penalty, or forfeiture, against which a court of equity will relieve." (quoting *Nickels v. People's Bldg., Loan and Saving Ass'n*, 93 Va. 380, 386 (1896))).

- 15 -

"The party challenging the validity of a liquidated damages clause has the burden of proof on the issue of whether the opposing party's 'damages . . . are susceptible of definite measurement or . . . the stipulated damages are grossly in excess of the actual damages suffered by the non-breaching party.'" *Boots, Inc. v. Singh*, 274 Va. 513, 517 (2007) (quoting *O'Brian*, 256 Va. at 551). Thus, in *Boots, Inc.*, the Supreme Court held that where appellee "presented no evidence at all relating to damages contemplated at the time of the sales contract," and "offered nothing to show that the amount . . . would be out of all proportion to any probable loss," appellee failed to meet their burden with respect to showing that the liquidated damages clause at issue was a penalty. *Id.* at 518.

As Bistro Manila's arguments indicate, the claim it raises regarding the enforceability of the Lease's accelerated rent provision centers on § 26 of the Lease. That section of the Lease, titled "Default," includes eight subsections, marked (a) through (h). The Lease's acceleration provision is housed in subsection (a), which, in relevant part, provides,

> Landlord shall have the right to declare an event of default hereunder, in which event, at Landlord's election, in addition to all other remedies available at law, in equity or hereunder, the total amount of the rent payable during the Term of this Lease, discounted to present value, as of the date of Tenant's payment thereof at the rate of four percent (4%) per annum, shall immediately become due and payable at the option of Landlord. Tenant acknowledges and agrees that this provision requiring the acceleration of rent in the event of Tenant's default is reasonable and is a material consideration to Landlord agreeing to enter into this Lease with Tenant.

Aside from the terms previously discussed *supra*, subsection (e) of § 26 further provides that

> Upon each such reletting all rents received by Landlord from such reletting shall be applied as follows: first, to the payment of any indebtedness other than rent due hereunder from Tenant to Landlord; second, to the payment of any costs and expenses of such reletting, including costs incurred by Landlord for brokerage fees, attorneys' fees and alterations and repairs; and third, to the payment of any unpaid portion of the accelerated rent provided for in Section 26(a), 26(c) or 26(d) of this Lease.

Broadly, § 26(a) addresses the acceleration of rent, providing that the "Landlord shall have the right to declare an event of default hereunder, in which event, at Landlord's election . . . the total amount of the rent payable during the Term of this Lease . . . shall immediately become due and payable at the option of Landlord." Section 26(e), in pertinent part, delineates how, following a default, rents received after the property is relet are to be applied against accelerated rents. Section 26(e), as applied to § 26(a), requires that (i) where there is a default, and the landlord (ii) elects for acceleration, and (iii) the property is then relet after such election, (iv) all rents received by the landlord from reletting the property be applied first to "any indebtedness other than rent due hereunder from Tenant to Landlord," then, second, to expenses related to reletting the property, and finally, third, to "any unpaid portion of the accelerated rent *provided for in Section 26(a)*."[11]

Accordingly, Bistro Manila's argument that, under the terms of the Lease, Alvah could "relet the premises and effect a *double recovery*,"[12] is not supported by the record. (Emphasis

---

[11] Because the plain language of § 26(e) expressly provides that its terms apply to and encompass § 26(a), Bistro Manila's argument that these two subsections "govern[] separate contingencies" fails as a matter of contract interpretation.

[12] Bistro Manila cites and puts special emphasis on two Virginia circuit court cases in supporting their accelerated-rents argument, both of which cut against the grain of their desired outcome. *See Tchrs. Ins. & Annuity Ass'n of Am. v. Prendergast Grp., Inc.*, 105 Va. Cir. 501, 504-06 (Fairfax 2020) (Ortiz, J.) (declining to hold rent acceleration provision unenforceable as a penalty where opponent failed to carry burden); *Tchrs.' Ret. Sys. of Ill. v. Am. Title Guar. Corp.*, 38 Va. Cir. 316, 316-18 (Fairfax 1996) ("Where a landlord of commercial property may mitigate his damages by re-letting the property, but the tenant is contractually bound to pay future rents regardless of whether the property is re-let, the acceleration clause potentially requires payment grossly in excess of actual damages."). These cases are inapposite and unavailing.

First, the facts in *Teacher's Retirement System of Illinois* are distinguishable from those here, where the subject Lease created a mechanism by which Bistro Manila could receive a credit for rents received following the property's reletting. As for *Teachers Insurance & Annuity Association*, Bistro Manila has failed to carry its burden in demonstrating that the Lease's acceleration provisions constitute an unenforceable penalty just as the opponent in that case. *See Boots, Inc.*, 274 Va. at 517 ("The party challenging the validity of a liquidated damages clause has the burden of proof on the issue."). To the extent that case held that "a reimbursement mechanism" akin to the one contemplated by § 26(a) and § 26(e) in this case constitutes an unenforceable penalty

added).  The Lease provides that rents received by Alvah after the property has been relet must be applied to, most importantly, any unpaid portion of the accelerated rent.  Hence, contrary to Bistro Manila's characterization, § 26(e) does protect against a double recovery on the facts of the present case by applying rents received after the property is relet to any unpaid portion of Bistro Manila's accelerated rent after they are first applied to any debts owed by Bistro Manila to Alvah and the cost of reletting the property.[13]  Because the arrangement delineated under § 26(e) establishes a mechanism that could protect against the runaway damages and "double recovery" Bistro Manila envisions by ensuring that unpaid liquidated damages track actual damages, Bistro Manila has failed to show that the liquidated damages here are "grossly in excess of the actual damages suffered by the non-breaching party." *Boots, Inc.*, 274 Va. at 517 (quoting *O'Brian*, 256 Va. at 551).[14]

---

which would force a former tenant to "insure the replacement tenant's contract," it does not control and we expressly hold to the contrary.  *See* 105 Va. Cir. at 506 n.2.

[13] As Bistro Manila itself acknowledges, in the cases it cites, "a key factor in determining whether a rent acceleration provision in a lease constitutes an unenforceable penalty is whether it requires the landlord to relet the premises and credit the original tenant with the rent received from the new tenant."

[14] Bistro Manila also raises questions about how this arrangement will operate in practice, posing, for example, "Would payments from a 3rd generation tenant be credited first against the obligations of the original tenant, or would the costs of commissions and reletting costs in the 3rd generation then be assessed against the credit of the original tenant?"  However, such practical considerations have no part to play in an analysis of whether challenged damages "are susceptible of definite measurement or . . . grossly in excess of the actual damages suffered by the non-breaching party." *Boots, Inc.*, 274 Va. at 517 (quoting *O'Brian*, 256 Va. at 551).

Moreover, Bistro Manila argues, among other things, that the language in § 26(e) "appears to only address the credit on the basis of current debts and expenses."  Thus, Bistro Manila also seems to argue, by implication, that, in the absence of any unpaid accelerated rent, the lease makes possible a double recovery.  To the extent that Bistro Manila makes this argument, it is Bistro Manila's burden to show that such would result in liquidated damages that are grossly in excess of actual damages.  It has not done so.  *See* Rule 5A:20(e).

CONCLUSION[15]

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*

---

[15] Alvah requests that "the Court . . . award additional attorney fees and costs to the Appellee." "The decision of whether to award attorney[] fees and costs incurred on appeal is discretionary." *Koons v. Crane*, 72 Va. App. 720, 742 (2021) (quoting *Friedman v. Smith*, 68 Va. App. 529, 545 (2018)). In making such a determination, the Court considers all the equities of the case and whether the appeal was "frivolous or lacked substantial merit." Rule 5A:30(b)(2)(C). After considering the record and all the equities of the case, we decline to award to Alvah the requested attorney fees.